COUNTY OF AUDRAIN, Appellant, v. JAMES MUIR.

Division One, March 5, 1923.

1. **INSANE WIFE: Confinement in Asylum: Obligation of Husband to Pay County.** The provision made by law for the support of an indigent insane wife by the county is a charitable provision, from which no implication of a promise by her husband to pay for the expense of her confinement in a state hospital arises in the absence of fraud, unless he enters into a special contract for re-
297 Mo.—32

payment; and in order for the county to recover back from him the amount of money it has paid the hospital for keeping her it must bring itself within the statutory provision (Sec. 497, R. S. 1919) and show that the husband was "bound to provide" for his wife's support and maintenance and was of "sufficient ability to pay the same."

2. **OBLIGATION OF HUSBAND TO WIFE.** Food, clothing, shelter, medical attention and such other things as every one must have are necessaries, which the husband, as long as he and his wife are living together as husband and wife, is bound and under legal obligation to supply to her, especially if she has no property or estate of her own and is unable to supply such necessities herself. But he is only bound to furnish her such necessaries while she is living with him at his home, and not when she is living apart from him without fault upon his part.

3. ———: Separation from Wife: Burden of Proof. The burden of proof is upon those seeking to hold the husband liable for the value of necessaries furnished by them to his wife, to show that their prior separation was on account of his misconduct, and not by reason of her delinquency.

4. ———: ———: ———: Instruction: Support of Insane Wife at Hospital: Recovery by County. An instruction telling the jury that if they find from the evidence that a certain woman was committed by the county court to a state hospital upon the application of defendant, and has been maintained therein as an indigent insane person at the expense of the county, and that defendant was, when he made such application, and still is, the lawful husband of said woman, and is of sufficient financial ability to repay the county the amount so paid out by it, the county is entitled to recover the amount, is properly refused, where there is substantial evidence that they had separated at the time the application was made. Said instruction was erroneous because it did not require the jury to find that the separation of defendant and his wife was on account of his misconduct, and not because of her delinquency.

5. ———: Ignorant of Separation: Instruction. The fact that those furnishing necessaries to the wife were ignorant of the fact that she and her husband had separated does not render the husband liable for the amount of money so paid out by them. They must take notice of such separation at their peril. Therefore, in a suit by the county to recover the amount of money paid out in maintaining defendant's insane wife at a state hospital, an instruction telling the jury that the prior separation of defendant and his wife because of the wife's defaults will not prevent a recovery by the county, unless the county court, at the time she was com-

County of Audrain v. Muir.

mitted to the hospital as an indigent insane person, had notice of said prior separation, is properly refused.

6. ———: ———: **Estoppel: Silence.** The fact that defendant at the insanity inquest stated that he was unable to support his wife at the state hospital, and gave his financial inability as his only reason for asking the county to do so, and consented to her being sent at the expense of the county, does not estop him, when sued by the county for the amount of money spent by it in maintaining her at the hospital, from showing that his previous separation from her was not his fault, nor are such request and reason evidence that he was living with her as her husband at the time. None of these things amount to false statements or misrepresentations, and therefore there was no estoppel.

7. ———: ———: **Subsequent to Insanity of Wife: Question for Jury.** Where the evidence is conflicting on the issue whether the wife was insane at the time she deserted her husband and lived apart from him and engaged in acts of indecent immorality, or whether her delinquency preceded her insanity, the court will not undertake to say that her delinquency was not her fault. There being positive evidence that she was not mentally incapacitated when she first "walked the streets" after leaving her husband's home, it will not be ruled on appeal that her insanity excused her delinquency and that therefore he was legally bound to pay for her necessities subsequently supplied by the county.

Appeal from Audrain Circuit Court—*Hon. Ernest S. Gantt,* Judge.

Affirmed.

*Frank Hollingsworth* for appellant.

(1) The husband, being bound to provide for the support and maintenance of his wife, comes within the provisions of Sec. 497, R. S. 1919, and is liable to the county for appropriations made by it for her support at an asylum as an indigent insane person. Dorrance v. Dorrance, 257 Mo. 317; Gabriel v. Mullen, 111 Mo. 127; Moran v. Monts, 162 S. W. 325; Charlestown v. Groveland, 15 Gray (Mass.) 15. (2) This statute (Sec. 497, R. S. 1919), is constitutional. Chariton Co. v. Hartman, 190 Mo. 77; Marshall Co. v. Burkey, 1 Ind. App. 565; Wapello

Co. v. Eikelburg, 140 Iowa 736; Kittery v. Dixon, 96 Me. 368; Bangor v. Wiscassett, 71 Me. 535; Brookfield v. Allen, 6 Allen (Mass.) 585; Re Renz, 79 Mich. 216; 13 R. C. L. 1190. (3) All the evidence showed that any indiscreet actions on the part of Verdie Muir occurred during her insanity and do not constitute a cause for separation. Goodale v. Lawrence, 88 N. Y. 513, 42 Am. Rep. 259; 19 C. J. 76. (4) Respondent by his acts, statements and conduct was estopped to set up as a defense any separation of himself and wife even for her fault. Goodale v. Lawrence, 88 N. Y. 513, 42 Am. Rep. 259; 13 R. C. L. 1200; City of St. L. v. Gaslight Co., 70 Mo. 99; Thompson v. Lindsay, 242 Mo. 53; Hoode v. Hahn, 222 S. W. 801.

*A. C. Whitson* for respondent.

(1) A husband is not liable for the support of his wife separated from him for her fault. When necessaries are furnished the wife while she and the husband are separated, in order to authorize a recovery therefor it must be shown that the separation was on account of the misconduct of the husband. Reese v. Chilton, 22 Mo. 598; Linderman v. Carmen, 142 Mo. App. 534. Where the wife has no cause to leave the husband he is not obligated to support her elsewhere. Rutheford v. Cox, 11 Mo. 347; Messenger v. Messenger, 56 Mo. 329. (2) The provision for support of the poor in an asylum is a charitable provision from which no implication of a promise to repay arises. Verdie Muir being committed each of the three times that she was sent to the asylum by the county court as an indigent insane person, no obligation arose against her or her estate or against her husband. Having been committed as a poor person under Secs. 12279 to 12297, R. S. 1919, the county is bound by its judgment that she was a poor person and entitled to support as a county patient, and it is estopped by its solemn record to set up the claim that she had or has an estate sufficient for her support or that the defendant was or is able

or bound to pay for such support.  Under Sec. 12297, action could have been taken to make her a pay patient if the facts had justified such to be done, but no such action was taken.  Chariton County v. Hartman, 190 Mo. 71; Montgomery County v. Gupton, 139 Mo. 308; Nodaway County v. Williams, 199 S. W. 226.  (3)  In the absence of statute the husband is not liable by reason of the relation alone, for the support of his wife in a public insane asylum.  And where there is such an express statute the better reasoning has held such legislative act to be unconstitutional as in violation of the provision for equality of taxation.  The husband with property pays taxes for the support of the institution and into the county fund for care of county patients and should not be required to again pay the cost of that maintenance to which he has contributed.  13 R. C. L. 1090, sec. 221; Baldwin v. Douglas, 20 L. R. A. 850; Richardson v. Struesser, 69 L. R. A. 829.

SMALL, C.—Suit under Section 497, Revised Statutes 1919, to recover $748.65 from the defendant paid out by the plaintiff county for the care and support of defendant's wife, as an indigent insane person in the State Hospital for the insane, from May 8th, 1917, to the 12th day of January, 1921, the date when the petition was filed.  From a judgment for defendant, plaintiff appealed.

The petition alleges that the wife was duly adjudged insane by the county court of said county on the 18th of May, 1917, upon the applicaton of the defendant, her husband, representing to said court that she was an insane person, and that both she and her husband were without sufficient estate or funds for her support at a hospital for insane persons.  Whereupon, by order of said county court, the wife, Verdie Muir, at the instance and request of defendant, was committed to State Hospital No. 1, at Fulton, Missouri, as an indigent insane person, and has continuously from and after said date been supported and maintained at said hospital at the expense

of· said county. That since said 18th of May, 1917, defendant has become and is now able to repay the plaintiff for the moneys so expended, and that he is legally bound to do so. That he has refused to pay plaintiff, although due demand was made upon him. Wherefore plaintiff prays judgment for the sum of $748.65 so expended and costs.

The answer, besides containing, a general denial, states that on November 3rd, 1913, one Verdie Muir was by said county court sent as an insane person to said State Hospital No. 1. That defendant and said Verdie Muir were not then, nor for more than one year prior thereto, nor have they since then lived together as, husband and wife. That they were not living together on account of the fault of said Verdie Muir and her violation of the marital relation, and defendant has not condoned her offense since said November 3rd, 1913.

The reply, after denying the new matter in the answer, alleged that defendant by reason of his application and consent to having his wife committed to the State Hospital, as an indigent insane person, at the expense of the county, is "precluded from denying the right of the plaintiff to recover in this cause, and is estopped from setting up as a defense thereto the marital infidelity or separation of himself and the said Verdie Muir."

The evidence of the plaintiff tended to show: That defendant's wife, as stated in the petition, was adjudged insane and sent to the State Hospital upon the application of the defendant. That both he and she were unable to support her in a hospital, or care for her as an insane person, and that the amount sued for was paid to the State Hospital by said Audrain County for her support and maintenance during the time stated in the petition. That demand had been made on defendant to repay said amount, which he refused to do. The plaintiff's evidence also tended to show that, at the time of making said application, both he and she were at his home in said county. That defendant paid for the automobile, helped

dress her, and assisted in taking her to the State Hospital.

At the insanity inquest, defendant stated that he was not able to pay the expense of keeping her at the State Hospital, and the county would have to pay the expense. He said nothing about his wife being separated from him, and the judges of the county court had no knowledge that she was ever separated from him. That plaintiff's wife had been previously committed on application of her brother to the State Hospital as a county patient, and was paroled, but her parole had expired on the 8th of May, 1917.

Defendant's evidence was as follows:

J. W. Barnett, testified in substance: "I was acquainted with her (Verdie Muir) about 1910 and 1911, which was the first I knew of her. She was living here in town, when I first knew her. She and Mr. Muir were living together. The next I heard of her, she was over on east Liberty Street. She was there a year or more I expect. Jim (her husband) wasn't staying down there. I don't know that I could say what she was doing; all I could tell is what I heard she was doing. I know she used to come down town, go out to Francis, she and another lady. The other woman didn't act much like she had much reputation. She came here from Louisiana or Hannibal or some other place. The two would be walking the streets at night. They went out together all the time. She went out of town on one occasion with this other woman. It was a cold night; she left her little boy (by a former husband) alone in the house, and the police went there and took care of him. She and this other woman were seen to get on the train together and go to other places. In 1912 her brother took her from this place on east Liberty Street to the State hospital. Never saw her in her husband's house until I, as sheriff, went over there in 1916 to get her and take her to the asylum. Defendant was not there at the time. Never saw her after 1916. Did not know she was sent to the asylum in 1917."

At. Brown testified: "It was about 1912 that I knew something about her. Saw her in company with some other woman take the Fulton train after dark. They would return at one of two o'clock in the morning. They would go straight off the streets and I never knew what became of them. But they came in real often from the east on that Burlington train. The repute of these two women at that time was bad. They were out on the street and out after men, that is the idea. In 1912 or '13, when she was on the street, it was generally understood that she was off in her mind, that was apparent from watching her. When she begun this street-walking, it didn't seem she was mentally incapacitated."

Re-cross-examination: "I first knew her in 1910, along there. First noticed she was insane along in 1911 or 1912. It then became apparent. Don't know just when she was taken to the asylum, after noticing her condition—a short time after that, 1913, I think."

P. Green, drayman, testified: He moved Verdie Muir from her husband's house, and a year or more afterwards, moved her back again. She sent for him each time. When he moved her back, she seemed to be in a demented condition. Her husband was there, when he moved her away, but not when he moved her back. Had been insane before I took her back; didn't consider her insane at that time. Reckon it was about 1912 when I moved her back. In 1917 she was living on Northwestern Avenue. Mr. Muir lived up there with her. He was living there with her part of the time. Do not know how long she stayed there.

Plaintiff testified that: He and his wife were living together in a house by the old pottery, and she became dissatisfied and moved "her stuff" away down to a house on east Liberty Street. She stayed there about a year. She only came back, when brought back by her relations. "Well, she came back, yes; Mr. Green brought her back, and the next day or day after, she had a paralytic stroke, and I telephoned her brother the next day, and he came over and took her to the State Hospital.

I wasn't at home when she came back. I don't know what her conduct was down there. I wasn't there. I know what I have heard, that's all. I had no way of finding out anything any other way. She never came back and offered to live with me as wife. I never took her back. She was over at the State Hospital two or three times. Her brother made application and paid for her for awhile. Then the county took her. When she came back the last time, her sister brought her there and left her at my house when I was not at home. The county court wasn't in session, and I think we had to wait probably a few days. Her parole had run out. They had to go before the county court to get her back there again. I think the neighbors requested it. I just went to make application like anybody else. She was there, and there had to be something done, and I didn't know what else to do. I stayed there with her just a day or two. Somebody had to stay there. That was my home, I stayed there. I signed the petition to send her to the State Hospital in 1917. The petition was true. I did represent to the court that I didn't have sufficient means to keep her. I didn't tell the court anything about being separated from her. I got two doctors to pass on her, and they went over there before the court, and the county court asked me if I had any money. I told them I didn't, and I didn't. Verdie Muir and myself were married thirteen years ago at Marshall. When she came back in 1917, there was nothing else to do but to receive her and take care of her. I couldn't kick her out and I couldn't kill her. I just kept her and got people to stay there with her a day or two until the county court was in session. Q. Now, I say you were willing to keep her there, because she was your wife? A. I did keep her, because there was nothing else to do, she was there. I wouldn't have let her 'lit' if she hadn't been insane, because I wouldn't have been there."

The evidence was conflicting as to defendant's ability to pay.

The court, by an instruction given on behalf of plain-

tiff, in substance authorized the jury to find a verdict for the plaintiff, if the jury found that when the defendant had his wife committed to the asylum in May, 1917, they were living together as husband and wife, or that said Verdie Muir was insane when she committed acts violative of the marital relation, and the county had paid for her support and maintenance at the State Hospital as an indigent insane person; provided, the jury believed that since said 18th day of May, 1917, defendant has become of sufficient financial ability to repay the county.

The plaintiff asked instructions to the following effect, which the court refused to give. Number 1: That if, at the time of the hearing of defendant's application to have his wife committed to the State Hospital as an indigent insane person, defendant gave as the sole reason for not supporting the said Verdie Muir at his own expense, the fact that he was unable to support her, because of financial inability, then he consented to her being committed to said hospital as an indigent insane person, and is estopped to set up as a defense in this case, any separation of himself and Verdie Muir by reason of her fault, prior to the date of commitment of the said Verdie Muir to said hospital. Number 2: That the above state of facts if found by the jury, might also "be considered by you in determining whether the said defendant at that time was living with said Verdie Muir in the relationship of husband and wife." Number 3: That if said Verdie Muir was committed to the State Hospital upon the application of the defendant, and has been maintained therein as an indigent insane person at the expense of the county, and the defendant was, when he made said application, and still is the lawful husband of said Verdie Muir, and defendant is of sufficient financial ability to repay the county for the amount so paid out, the jury will find for the plaintiff the amount so paid, not exceeding the amount sued for. Number 4: "The court instructs the jury, that even though you may believe from the evidence that James Muir and Verdie Muir were separated through fault of said Verdie Muir

at the time she was committed by the County Court of Audrain County to the State Hospital as an indigent insane person, yet that fact will not preclude the plaintiff in this case from recovering, unless you further find that the county court at said time had notice of the separation.''

The court on behalf of the defendant gave the following instruction:

''The court instructs the jury that if you find and believe from the evidence that Verdie Muir prior to her incarceration in the State Hospital at Fulton did have unlawful association with men and after knowledge of such the defendant did not live with her as her husband, or if you find that the said Verdie Muir had more than one year prior thereto left the home of the defendant and deserted him without just cause, you will find that the defendant at the time of her incarceration in the State Hospital had good cause not to live with the said Verdie Muir as her husband and that he was not obligated to support her and your verdict will be in favor of the defendant, unless you find that she was insane and incapable by reason of such insanity to distinguish between right and wrong at the time or times she had unlawful association (with) men or at the time she left the home of defendant and deserted him.''

I.  Section 497, Revised Statutes 1919, is as follows: ''In all cases of appropriations out of the county treasury for the support and maintenance, or confinement of any insane person, the amount thereof may

**Statutory Obligation.**  be recovered by the county from any person, who by law is bound to provide for the support and maintenance of such person, if there be any of sufficient ability to pay the same.''

The provision made by law for the support of poor or indigent insane is devolved by the statute upon the counties of which they are inhabitants.  [Cox v. Osage County, 103 Mo. 385;  Montgomery County v. Gupton, 139 Mo. l. c. 308;  Chariton County v. Hartman, 190 Mo.

l. c. 76-7.] It is well settled at common law, that the provision made by law for the support of the insane poor by the county is a charitable provision "from which no implication of a promise to pay arises" in the absence of fraud, without a special contract for repayment. [Chariton County v. Hartman, supra; Montgomery County v. Gupton, supra.]

So that in order to recover in this case, the plaintiff must bring itself within the statutory provision and show that defendant was "bound to provide" for his wife's support and maintenance, and was of "sufficient ability to pay the same."

II. There is no doubt that, at common law, "food, clothing, shelter and medical attention and such things as everyone must have" are absolute necessities, which the husband, as long as he and his wife are living together as husband and wife, is bound and
**Obligations of Husband.** under legal obligations to supply to his wife, especially if she has no property or estate of her own, and is unable to supply such necessaries herself. [Johnson v. Briscoe, 104 Mo. App. 500, opinion by GOODE, J.; Miller v. Brown, 47 Mo. 504; Barr v. Armstrong, 56 Mo. 577-589; Sauter & Adams v. Scrutchfield, 28 Mo. App. 150; Reese v. Chilton, 26 Mo. 598.]

III. But it is equally well settled, that he is only bound to supply such necessaries while his wife is living with him at his home and not when she is living apart from him, without fault on his part.
**Obligation to Defaulting Wife.** The burden of proof is upon those seeking to hold the husband liable in such cases, to show that the separation was on account of his misconduct and not by reason of her delinquency. [Porter v. Bobb, 25 Mo. 36; Harshaw v. Merryman, 18 Mo. 108; Reese v. Chilton, 26 Mo. 598; Linderman v. Carmin, 142 Mo. App. l. c. 534; Rutherford v. Coxe, 11 Mo. l. c. 352-353.] Plaintiff's instruction numbered 3 was therefore properly refused.

IV.   Nor does the fact that those furnishing the wife with such necessaries were ignorant of the separation, render the husband liable.   They must take notice of it at their peril.   [Porter v. Bobb, and other cases cited, supra.]   Plaintiff's Instruction 4 was therefore properly refused.

**Ignorant of Separation.**

V.   The fact that defendant at the insanity inquest in May, 1917, stated that he was unable to support his wife at the State Hospital, and gave no other reason for not doing so himself except his poor financial condition, and that he requested and consented to her being sent to the State Hospital at the expense of the county, did not estop him from showing in this case, that his separation from his wife was not his fault.

**Estoppel.**

It is not claimed that he made any false statements or misrepresentations.   Nor were such statements evidence that he was living with said Verdie Muir as her husband at the time they were made.

Plaintiff's Instructions 1 and 2 were therefore properly refused.

VI.   But it is earnestly contended that defendant's wife was insane at the time she deserted her husband and lived apart from him, and, therefore, that her frailty was not her fault, but her misfortune; that the evidence of defendant shows her insanity at that time so clearly, that there is no substantial evidence to the contrary.   It is true, the defendant's evidence shows that she was mentally afflicted shortly after, or about the time, she left defendant.   Defendant failing to testify as to her mental condition, when she left him, is strong evidence to show that she was insane at that time.   It is, however, not conclusive.   The defendant's witness, Brown, testified that she was not mentally incapacitated when she first "walked the streets" after leaving her home, but became so afterwards.   In this state of the evidence, whatever we might have concluded as jurors, had we sat in the jury box, we

**Wife's Insanity.**

must rule as judges sitting upon the judicial bench, that whether her delinquency existed before, or was contemporaneous with, or was caused by her insanity, was a question for the jury to determine.

We think the case was fairly submitted to the jury under the instructions given by the court, and that there is no reversible error in the record. The judgment appealed from, is, therefore affirmed. *Lindsay C.*, concurs; *Brown, C.*, not sitting.

PER CURIAM:—The foregoing opinion of Small, C., is hereby adopted as the opinion of the court. All of the judges concur.