Donna D. RIGGS and Jack W. Riggs, Respondents,

v.

John E. METCALF, Appellant.

No. 46439.

Supreme Court of Missouri.

Division No. 1.

Sept. 8, 1958.

Rex Titus, A. L. Shortridge, Joplin, for appellant.

Bond, Bond & Buehner, Joplin, for respondents.

DALTON, Chief Justice.

Action for damages sustained in a collision of automobiles in Joplin, Missouri. Verdict and judgment were for plaintiffs, to wit, for Donna Riggs on the first count for $20,000 (personal injuries) and for Jack W. Riggs, husband of Donna Riggs $2,500 on the second count (loss of services, etc.) and (by agreement of parties) for Jack W. Riggs for $80 (property damages) on the third count. Defendant has appealed.

About 5:00 p.m., on January 6, 1956, plaintiff Donna Riggs was driving her husband's 1955 Ford station wagon south on Main street between Ninth and Tenth streets in Joplin, in heavy traffic and had stopped 5 feet to the rear of another southbound automobile near the Ninth street intersection. Another automobile, referred to as the Perry automobile, was stopped 3 to 5 feet behind the Riggs' station wagon and, after some 10–20 seconds, the automobile ahead of Donna began to move and she started forward at about two miles per hour when defendant's automobile collided with the rear of the Perry automobile and drove it forward into the rear of the Riggs' station wagon and plaintiff Donna sustained a whiplash injury to her neck and other injuries. At the close of all the evidence the court directed verdicts for plaintiffs on the issue of liability.

Defendant-appellant contends the verdicts and judgments rendered on counts I and II are grossly excessive and not justified by any competent and substantial evidence; and that the court erred in giving Instruction No. 1 and in refusing Instruction No. 6. No authorities are cited in support of either of the last two assignments. We shall consider the last assignment first. The effect of Instruction No. 6 was to withdraw from the jury's consideration any damages relative to hospital and medical expenses. It would have told the jury " * * * that in your consideration of damages neither plaintiff can recover anything for medical or hospital expense incurred by plaintiff Donna Riggs as a result of the accident in question." Appellant contends that "neither of the respondents testified or offered any evidence that they, or either of them, had incurred or become liable for any medical or hospital expense."

Plaintiffs pleaded, and defendant admitted by answer, "that at all times mentioned herein plaintiff Jack W. Riggs, was the

husband of Donna D. Riggs, and entitled to services, earnings and society of the said Donna D. Riggs." Appellant in his brief admits that "respondent Jack W. Riggs, as the husband of respondent Donna D. Riggs, would be legally responsible for her care and support, which would include medical and hospital bills, but (says) there is no testimony in the record that he owed them or had paid them."

We agree that there is no direct testimony that Jack owed or had paid the mentioned bills, however, the record shows that he took his wife in his automobile to Kansas City on a number of occasions to see Dr. Poser; and that he was present when Dr. Poser advised her to quit working at Ramsey's. Without objection, plaintiffs' attorney was permitted to ask Dr. Hurst and obtain the answer "yes" to the question: "Did you, Doctor, at my request or possibly Mr. Buehner's request total the charges which you have made or will make to Mrs. Donna Riggs, *I suppose to her husband*, as of the date February 27, 1957?" (Italics ours). The several statements for medical and hospital services rendered to Donna (totaling in excess of $1,000) were, in most instances, directed to Mrs. Donna Riggs or Mrs. Jack Riggs at her residence where she resided with her husband. There was evidence that various charges for medical services and hospitalization were reasonable and proper and the statements therefor were admitted in evidence without objection.

Appellant says they were admissible in Donna's case as evidence of injury. The record further shows that Donna's salary, when employed before her injury, was $140 per month and commissions; and that she has been unemployed since June 1956. Her husband owned and operated a tool and die shop in Joplin.

■ There is no contention here that the services rendered Donna were not necessities in view of her injuries. There is no evidence in the record directly show-ing that the hospital and physicians rendering the services to Donna extended credit personally to her, or relied alone upon her responsibility or had any contract with her to the exclusion of her husband. See McLean v. Kansas City, 81 Mo.App. 72; Lowenstein v. Widdicomb, Mo.App., 52 S.W.2d 1044; Johnson v. Briscoe, 104 Mo.App. 493, 500, 79 S.W. 498; Audrain County v. Muir, 297 Mo. 499, 249 S.W. 383, 386; Wilt v. Moody, Mo.Sup., 254 S.W.2d 15, 19. On this record nothing appears to rebut the presumption of liability of plaintiff's husband Jack for the amounts due for the medical and hospital services rendered to his wife Donna. Instruction No. 6, was therefore, properly refused.

■ Appellant contends that Instruction No. 1 is erroneous because it assumed and did not require the jury to find that Jack W. Riggs was "in fact damaged through the loss of services of his wife" and further assumed and did not require the jury to find that he "had in fact incurred expense for doctor and hospital bills."

In the second count of the petition plaintiff Jack sought to recover damages on account of expenses necessarily incurred for nursing care, medical attendance and hospitalization of his wife because of her injuries and, also, for compensation for the loss of her services, earnings and society. As stated, it was admitted by the pleadings that Jack was the husband of Donna and, as such, was entitled to her "services, earnings and society." Instruction No. 1 first submitted a finding that "if you find and believe from the evidence that plaintiff, Donna Riggs, was *injured* and Jack Riggs was *damaged* as a direct and proximate result of the collision, mentioned in evidence" (Italics ours) and, subsequently, the instruction submitted a further finding, that "if you further find and believe from the evidence that plaintiff, Jack Riggs, was damaged as a direct and proximate result of the collision mentioned in evidence, then you will assess his dam-

ages at such sum as shown by the evidence will compensate him for the loss of services of his wife and the expenses he has necessarily incurred for doctor and hospital bills directly resulting from the injuries to his wife." While the instruction is not in an approved form, it does require a finding that plaintiff Jack was damaged, and we think the inference is sufficient as to how damaged, before directing the assessment of the damages. In view of the issues presented and the manner in which the cause was tried, we do not consider the form of the instruction to be misleading or prejudicially erroneous under the record in this case.

Appellant next contends that the instruction is erroneous because "there was no evidence whatsoever that respondent Jack Riggs had in fact incurred or was obligated for any medical or hospital bills." This contention has been ruled against appellant in overruling the assignment of error as to Instruction No. 6.

■ Appellant also contends that Instruction No. 1 is erroneous because "no evidence was offered or received as to any value of the alleged services furnished"; and that "all evidence offered, as to the alleged limitations of respondent Donna D. Riggs in fully performing her usual household duties and rendering other services, related solely to describing her physical conditions." Appellant says "the record is devoid of factual proof regarding loss of services," and that "no monetary value of loss of services can be placed on a mere description of physical condition."

It has been said that the word services "implies whatever of aid, assistance, comfort, and society the wife would be expected to render to or bestow upon her husband, under the circumstances and in the condition in which they may be placed, whatever those may be." See Womach v. City of St. Joseph, 201 Mo. 467, 100 S.W. 443, 448, 10 L.R.A.,N.S., 140; Furnish v. Missouri Pac. Ry. Co., 102 Mo. 669, 676, 15 S.W. 315.

The evidence hereinafter set forth as to the wife's physical condition, after the receipt of her injuries, and her inability to perform many of her domestic duties is sufficient to show loss of her services by her husband. It is true that no direct evidence was offered as to the value of Donna's society and services to her husband, but the facts and circumstances shown by this record, as hereinafter set out, concerning their relationship and Donna's inability to render services are sufficient to sustain the giving of the instruction.

■■ It is well settled that "the husband is entitled to recover for the loss of services of his wife of which he is deprived by the negligent act of another, even though the parties are in such circumstances that the wife is not accustomed or desired to do physical labor." Hengelsberg v. Cushing, Mo.App., 61 S.W.2d 203, 204; Baldwin v. Kansas City Rys. Co., Mo. App., 231 S.W. 280, 282; Womach v. City of St. Joseph, supra, 100 S.W. 443, 448. Further, in a case where the husband seeks to recover for the loss of his wife's society and services it is not necessary to offer definite proof of the value of the wife's society and services. This is, in part, on the theory that the subject does not reasonably admit of direct proof of value. The rule is that, when the fact of the loss of services is shown by proof of the wife's disability from performing such services and the extent and character of the duties which she is unable to perform as a housewife are shown, the jury may infer the reasonable value from the facts and circumstances. Further, the character of services here were of such character that almost any intelligent citizen may be presumed to know the reasonable value thereof, as a matter of common knowledge. See Bruce v. United Rys. Co. of St. Louis, 175 Mo.App. 568, 158 S.W. 102, 105(4); Hengelsberg v. Cushing, supra; Baldwin v. Kansas City Rys. Co., supra; Furnish v. Missouri Pac. Ry. Co., supra, 15 S.W. 315; 41 C.J.S. Husband and Wife § 440b, p. 949. The assignment is overruled.

Were the verdicts excessive? Appellant does not contend he was not negligent nor complain because the issue of liability was directed against him. He insists that the amounts awarded to Donna and to Jack were grossly excessive and he asks that "respondents be required to enter a remittitur of the more substantial portion of the judgments," or that the judgments be reversed and the causes be remanded for a new trial.

■ In determining the issues presented we shall consider the evidence in a light favorable to plaintiffs and to the verdicts returned by the jury, since the jury could have so found the facts as a basis for determining the amounts awarded. Evidence less favorable or contradictory will be disregarded.

Donna was about 29 years of age at the time she was injured. She and Jack had been married about eleven years and they had two daughters, six and nine years of age, respectively. For several years she had been regularly employed as a saleslady at Newman's and later at Ramsey's.

The severity of the impact causing Donna's injuries appears from the evidence. As stated, Donna, after having been stopped in heavy traffic, was driving forward at about two miles per hour. The brakes were not applied. The front bumper of the Perry automobile was 4 to 6 feet to the rear of the Riggs' station wagon. Like Donna, Mr. Perry had been stopped for some seconds and, when he saw defendant's automobile approaching from his rear, he signaled his position by flashing his brake lights and then applied his brakes and braced himself for the crash. His automobile was driven forward by the impact into collision with the Riggs' automobile. The trunk of the Perry automobile was mashed, the rear tail lights knocked out, the rear bumper bent, the two rear fenders damaged, the front parking lights knocked out and the center section of the grille and the front bumper were bent. The lower quarter panel in the rear of the station wagon, or lower door and body, was pushed in about six inches, the rear bumper was bent and the two bumper guards torn loose and the vehicle otherwise damaged. Donna's packages on the seat of the station wagon were knocked to the floor, the contents of her purse spilled and she was thrown forward over the steering wheel and her right knee hit the dashboard. Her neck "began to hurt right from the very beginning." Immediately after the collision she advised Mr. Perry that her neck had been "popped by the impact." He suggested she go to the hospital, but she was able to drive the station wagon to her home.

Donna was not able to contact her family physician until 8:30 p. m. He advised her to meet him at St. John's Hospital the following morning where X-rays were taken and she was put "in traction with medication." She was not nervous before she was injured and had never been of the nervous type, but she was nervous and high strung in the hospital after the accident and was given medicine for her nerves. After five days, she was returned to her home where she had traction (to the extent of 15 pounds) for six weeks and wore a collar with a brace and stays to hold her neck firm and in one position. She had a burning sensation, if she turned her head. About February 13, 1956, she returned to her work as a saleslady in Ramsey's Department Store in Joplin. She continued to take treatments from Dr. Sidney W. Scorse at his office, wore the collar after work and took some traction. The doctor instructed her to work, but it hurt her to work, and it hurt everytime she used her arms to show lingerie to customers. The lingerie was kept in boxes on the shelves. She continued to receive ultra sonic treatments (electricity for deep muscles), shots and medication from Dr. Scorse.

About April 1956, her condition became worse (Dr. Scorse was in the hospital for treatment) and she went to Dr. W. H. Hurst. He started electric tractolator treatments and medication. The treatments caused pain and discomfort to the back of

her neck and it pulled down on the shoulders and arms. Dr. Hurst then sent her to Dr. Poser, a neurologist in Kansas City, about May 8, 1956. She saw Dr. Poser on some five occasions. He wanted her to use her arms as much as possible and take exercises using her arms. He insisted that if she didn't use her arms they would become completely stiff. In June 1956, he advised her "to go off on a long vacation and relax." Jack then drove her and the children to Florida for a week's vacation. She thereafter had to quit her job at Ramsey's and hasn't been able to resume work.

She is now limited by her injury in everything she tries to do in daily life about her home. She can't hang out clothes and has hung out only a few pieces since she was hurt. Each time she uses her arms, especially raising them, she suffers pain. She can't iron and has to send the ironing out. If she plays with the children her neck hurts the next day. She makes the beds and sometimes does the dishes, but seldom sweeps. She is limited in all housework because it hurts her neck, shoulders and arms and she has to rely on her mother who lives in the home. She has danced only once since her injury and she was sick the next day, sore all over, and her arms were sore. She can get in the water with her children but cannot try to swim. If she lifts her little daughter she suffers pain in her arms, shoulders and neck. Before her injury she would go dancing, attend baseball games and play with the children. Now she has constant pain and hurting and, if she gets tense and nervous, the reaction and pain are much worse. Just trivial matters will now cause her to get nervous and upset, matters that did not bother before she was hurt. Her neck stays stiff, she can't put her chin down on her chest like she should, or turn it to either side and it is always more or less stiff and hurts. There is more pain if she leans her head back than when she leans it forward. It hurts to turn her head. Movement of the head causes pain down to sore spots in her back. She also has headaches which

start in the back of the head and come forward and they have to be worn off. When she goes out, she has headaches constantly. When at home, she has headaches perhaps only once a week or perhaps not for two or three days. Aspirins and anacins give no relief. She does not sleep well. She will lie for several hours and not be able to sleep and she will get up and roam around the house. Restless and sleepless nights are frequent. None of the drugs helped much, except cortisone, but she can't take it because of adverse reaction. The drugs she is now taking help some, give some relief. She has not been discharged by her physician. She had received treatment by manipulation of her neck, traction and other tractolator and ultra sonic treatments. She has some good days and plenty of bad ones, but thinks she is improving.

She had an operation on her right breast in January 1955 and on her left breast in November 1956. The last trouble developed in April or May, 1956. Any tenseness or anxiety caused by the lumps in her breast in April to June 1956 may have persisted until November 1956, but she wasn't too worried, since no malignancy existed at the time of the 1955 operation. She never had any tenseness before she was hurt in this accident that was like the tenseness she had after her injury. She had never had any soreness in her arms like she had after the accident. There was soreness and swelling in the right breast in December 1954, before the first operation, and the trouble did cause "the arm to be sore" and the soreness was gradually getting worse, until the lump was removed. The same type of soreness developed in April or May 1956, but X-ray treatments and shots took out the soreness and she did not let the difficulty run like she did in 1954. After the April difficulty developed, she still had the same amount of pain in her arms that she had after the accident and before April 1956.

Following the accident she not only had pain in her neck, shoulders and arms, but had pain right down her back. The pain in

her back has more or less disappeared, although she still has it. She did go to work in February 1956 on the advice of her physician, but the lifting of boxes bothered her, as she had to reach chest high or higher to get them. She "definitely" had trouble lifting the lingerie boxes. She still cannot lift her arm up to 80 per cent of normal, or above her head, it would cause severe pain. Any pain, tenderness or anxiety in November 1956 may have been partly caused by her breast condition and operation, but that condition couldn't have caused her condition since the nodule was removed. She can only drive an automobile with power steering. She drives about town on household errands, but has not driven more than a few minutes on any trip out of town. She has accompanied her husband on several such trips.

There was other evidence that prior to her injury, Donna worked every day and did not appear to be nervous, but since the receipt of her injuries, she has been very nervous and irritable and very uncontrollable in the manner in which she talks; that she cries often and worries about her condition and wonders if she is getting better or will have to continue to see doctors. She complains nearly every day of nervousness, headaches, pains in her arms, neck and shoulders. While she does some housework, she complains that she does not feel well. Every night or so, or perhaps several nights in a row, she will not be able to sleep and will get up and move about. She has intercourse with her husband less often than she did before her injury, because of the fact that she does not feel well. She goes out little in social life with her husband, because of the way she feels. He can't take her anywhere and have her feeling good.

From the medical evidence the jury could have found that Donna sustained a whiplash injury to her neck and "generalized body bruises * * *, all soft tissue damage." On the day following injury, "she was having a considerable amount of pain in the neck region, especially, an inability to move the neck." Rotary movements of the head and from side to side caused "pain in the neck high up." Backward and forward motion was impaired and there was considerable muscle spasm of the paravertebral muscle alongside the spinal column. The muscle was tight, tense. By February 17, 1956, the body bruises had cleared, but she was still having pain in her neck and in the right knee from soft tissue damage. Dr. Scorse prescribed the neck collar to immobilize the neck and take some of the weight off. He also prescribed medication and traction. She was still having considerable pain and had not recovered from the neck injury when Dr. Scorse was hospitalized in April 1956. Her emotional stability or instability was aggravated by her neck injury and she was much more nervous when he last saw her on April 10, 1956 than she was before. While a lump was removed from Donna's right breast on January 12, 1955, it was not malignant and she was so advised. About that time she complained of pain in the low back and of some nervousness for which he prescribed a mild sedative. There was also sufficient swelling of the breast to cause pain, tenderness and muscle spasm. Her nervousness at that time was not of a continuing nature, it was from pain in the low back and breast and was not of the type resulting from the neck injury, where the symptoms were more severe and the pain definitely much worse. These symptoms could not have been caused by 1955 conditions. The low backache in January 1955 was nothing of any significance.

When Dr. Hurst examined Donna in April 1956, he found marked spasm in the trapezii or shrugging muscles in the back of the neck. They were very tight in flexion and extension and there was a loss of flexion in the cervical spine of 30 degrees and there was a 45 degree loss of rotation of the neck. She could not "rotate her head." He gave her a number of one hour treatments on a stretching machine using pulls, up to almost 30 pounds, but discontinued that treatment as it aggravated her

headaches. On later examination her neck was still stiff, with tenderness at the base of the skull and muscle spasm, and her shoulders were bothering her. He had her resume the tractolator treatments to overcome muscle spasm and because his examination showed an increase in neck stiffness. He also prescribed a tranquilizing drug and noted that she had a great deal of nervous tension and seemed to be getting worse. He sent her to Kansas City to Dr. Poser, a neurologist.

Dr. Poser saw Donna some five times from May to September 1956. He found severe limitation of motion in all directions at the shoulder joint, mainly on abduction, severe muscle spasm and induration of the posterocervical muscles as well as the trapezii and rhomboids, and hyperactive deep tender reflexes throughout. The trapezii muscles were hard, swollen and in an inflammatory condition. These muscles cover the back of the head and back of the shoulders. The muscles were under an unusual amount of involuntary tension, a painful condition. He prescribed drugs to induce relaxation of muscle spasm. While there was some improvement in September 1956, she still had muscle spasm in the muscles of the neck, posteriorly. Her arms had improved so she could lift them within 80 percent of normal range. She still had pain on motion of the neck in any direction and it had not shown much improvement. It was Dr. Poser's opinion that Donna had sustained a whiplash injury of moderate severity to the cervical spinal cord, a painful injury, which results immediately in severe pain in the neck and usually gives headaches and causes pain which radiates down the shoulders and into the arms and he believed such had happened in this case. The neurological symptoms and signs which Donna exhibited were the result of an injury to the central nervous system leading to the hyperactivity of the nerves to the muscles in spasm. The condition is very difficult to treat and responds very poorly to almost any type of therapy and the symptoms may go on for a year or

two, or even longer. He got the impression that Donna had a pretty high tolerance for pain to have been able to do some of the things she did which caused pain. She was definitely handicapped in her daily duties as a housewife by her condition and the constant pain makes her depressed psychologically. She definitely had psychological changes which in his opinion were the result of her injuries.

After, as well as during Donna's visits to see Dr. Poser, Dr. Hurst continued to see and treat her. In October 1956, he gave her a drug to put her to sleep and paralyze all of the muscles in an effort to determine how much of her difficulty was psychiatric and how much was in the bones and joints. The trapezii muscle did not relax and Donna's head was locked because of adhesions between the couplings of the neck. He finally broke the adhesions and later placed her in traction to prevent the adhesions from reuniting, but a month or so later, he found that she still had a lot of adhesions. Her nervous condition remained the same and she was quite tense. She had a neurosis in the neck region. Various new drugs were tried. When examined a month prior to the trial she showed some improvement, less pain in the arms and neck, rotation of the cervical spine was limited 20 degrees, she could bring her chin down to half an inch of her chest and there was still definite muscle spasm in the group of muscles on the side (levator scapulae) and the scalenii muscles which attach to the back of the head and run down to the collar bone. She still suffers from a definite "necklash injury, which has set up with moderate to severe degree in order to give her the degenerative changes in the nerves" (of the nerve arm in the brachial plexus of the spine) resulting in wasting or decrease in measurements of her right arm and in loss of pinpoint sensation over the right side of the right shoulder blade.

As a result of the injury, in his opinion, she has 50 to 60 percent disability of the body as a whole. Her condition is permanent and she is going to be worse. She is

still under his care and medication. In answer to a hypothetical question he gave it as his opinion that the accident of January 6, 1956, was the cause of Donna's physical condition at the present time. The operation for the removal of the "blue dome cyst," which developed in April 1956 and was removed by operation in November "had no effect upon her mental state of mind, upon her nervousness or upon her psychosomatic make-up."

■ In support of appellant's contention that the $2,500 awarded to Jack was grossly excessive under the evidence, appellant says "it is impossible to determine the amount of any difference in the activity of his wife, Donna," before and after her injuries. We find no merit in the assignment on any ground. The bills for hospital and medical services exceeded $1,000, and the evidence as to Jack's loss of services resulting from Donna's injuries would support a judgment for an amount in excess of the judgment rendered in favor of Jack.

In support of the contention that the award to Donna is grossly excessive, appellant says she sustained no injuries to her bones and was able to resume work some six weeks after sustaining the neck injury and to continue working until after breast nodules (not connected with the injury) developed. Reference is also made to evidence in the record tending to show that she was psychologically normal and sustained no injuries to muscles or nerves; that her symptoms were subjective; that she was very nervous and high strung and of unsound emotional stability before the accident and, also, after the development of breast trouble; that a determination of the portion of her condition caused by the accident would be pure speculation; that the tenseness and limitation of motion of the muscles in her neck and shoulders is temporary and is also voluntary; that tenseness released when her attention was distracted; and that, in prior years before the accident, she had complained of tenderness and pain in the low back and in the neck and

shoulders. The credibility and weight and value of this evidence was for the jury and, apparently, it was given little weight.

Appellant asks us to weigh some of this evidence and determine certain fact issues contrary to plaintiff's evidence, but we may not do so. Respondent Donna is entitled to a favorable view of the evidence in determining whether the amount of the judgment is supported by substantial evidence. She sought recovery both for personal injuries sustained, and wages lost, and so submitted her cause. None of the cases cited by the parties deal with closely similar injuries and in none were the parties of similar age and earning capacity. Each case can be easily differentiated on its facts. Appellant cites Brown v. Payne, Mo.Sup., 264 S.W.2d 341, 348, where a 41 year old woman sustained certain neck, arm, and other injuries, but has continued her employment, was not hospitalized, received little medical treatment in the past and none is indicated for the future, lost no wages, had no injury to the spinal cord and a $10,000 verdict was approved for $7,000.

Each case must be considered upon its own peculiar facts. We have so considered this case and have also taken into consideration the usual matters for consideration in a case where the verdict is alleged to be excessive. See Brown v. Payne, supra, 264 S.W.2d 341, 348; Roderick v. St. Louis Southwestern Ry. Co., Mo.Sup., 299 S.W.2d 422, 429.

■ The favorable evidence in Donna's case is sufficient to show that a regularly employed married woman earning $140 per month and certain commissions has sustained serious, permanent and painful injuries which have resulted in 50 to 60 percent disability of her body as a whole; that the condition is permanent; and that her injuries have caused degenerative changes in the nerves, which changes are progressive, and her condition will get worse. Under the facts shown we do not find the verdict sufficiently excessive to require any remittitur. We have found no cases closely similar, but

compare McCaffery v. St. Louis Public Service Co., 363 Mo. 545, 252 S.W.2d 361, 369 (where the plaintiff had less expectancy and more earnings); and Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120, 125 (where the plaintiff sustained less injuries, was much older and had lost no wages).

The judgments appealed from are affirmed.

All concur.