Mary Lou HOPKINS and William B. Hopkins, Plaintiffs-Respondents,

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, City Products Corporation, a Corporation, Walter C. Stock, and Ronald Casperson, Defendants,

St. Louis Public Service Company, a Corporation, Defendant-Appellant.

No. 31790.

St. Louis Court of Appeals.
Missouri.

Sept. 25, 1964.

James Ruddy and John D. Schneider, St. Louis, for defendant-appellant.

F. Douglas O'Leary, St. Louis, for defendant Walter C. Stock.

James T. Williamson, St. Louis, for defendant Ronald Casperson.

Hullverson, Richardson, & Hullverson, Corinne Richardson, Everett Hullverson, St. Louis, for plaintiffs-respondents.

BRADY, Commissioner.

This appeal arises out of a suit for damages wherein the plaintiff, Mary Lou Hopkins, prayed for $35,000 and her husband, William Hopkins, in a separate count of the petition prayed for $10,000 for costs of household help, his wife's medical expenses, and for deprivation of her "* * * aid, assistance, and companionship." The jury's verdict was in favor of Mrs. Hopkins for $15,000 and in favor of William Hopkins in the amount of $4,000. These judgments were rendered against the St. Louis Public Service Company and one Casperson, the driver of an automobile involved in a collision with the company's bus. The timely after-trial motion of the defendants was overruled and the company filed its notice of appeal with the Supreme Court of this state. Thereafter, Casperson paid $4,000 on Mrs. Hopkins' judgment and $1,000 on William's judgment. Since this reduced the amount in dispute to $14,000, the company filed its motion to transfer this appeal to this court and the cause was transferred. We will hereafter refer to the St. Louis Public Service Company as the defendant and to Mr. Casperson by name.

The allegations of prejudicial error concern the giving of Instructions No. 2, 5 and 6 and the contention that the verdicts were so grossly excessive as to require a new trial or, in the alternative, a substantial remittitur. The factual situation appearing in this opinion will be limited to these contentions and will be stated in the light most favorable to the plaintiffs who prevailed in the trial court.

William Hopkins was not present at the scene of the collision. Mrs. Hopkins was a passenger on the company's westbound Manchester bus and was seated behind the bus driver on the left side of the bus. As the bus was crossing Kingshighway it was involved in a collision with a southbound

automobile driven by Casperson who had violated the electric traffic signal. At this point Manchester is 62 feet wide and Kingshighway is 76 feet wide. There were four to five inches of snow on the ground and the pavement was slippery. The company's driver had pulled the bus to the northeast corner of the intersection to make its regular stop so that passengers could get on and off the bus. The driver testified that there was an automobile in front of the bus in the curb lane but other witnesses testified to the contrary. An automobile driven by Walter Stock was stopped on Manchester, headed west, in the lane nearest the center line. When the light changed he and the bus began to go forward together. He drew slightly ahead of the bus and when he was ten to fifteen feet into Kingshighway, he saw Casperson's automobile about 150 feet north of the intersection coming south on Kingshighway at a speed of 25 to 30 miles per hour. There was other evidence that Casperson's speed was 30 to 35 miles per hour. Stock was then traveling at a speed of five to ten miles per hour and reached a maximum speed of twenty miles per hour before completely crossing the intersection. He heard a scraping noise at the right rear fender of his car when the left side of the bus contacted it. He did not see the collision between the bus and Casperson's automobile. Stock's daughter was in his automobile with him and her testimony corroborated that of her father. She did add that Casperson was traveling in the lane next to the center as he approached on Kingshighway.

Several passengers testified on behalf of the plaintiff. Mr. Hutchinson testified that after the bus had moved about five feet out into the intersection, he saw Casperson's automobile about six car lengths from the intersection. He estimated a car length at fifteen feet. This automobile and the bus continued on their paths. When the bus was about three feet from the center line of Kingshighway, Hutchinson felt the brakes on the bus being applied. The bus traveled about ten feet from this point to the point of impact. Miss Kapfer testified that when the bus was one-fourth to one-half way across the intersection, she saw Casperson's automobile about five car lengths from the intersection traveling at 30 to 35 miles per hour.

Casperson testified that he was sixty to seventy feet north of the intersection when the bus started out into it. Acheson, the driver of a southbound bus stopped on the west side of Kingshighway north of the intersection, testified that when the bus on which Mrs. Hopkins was riding entered the intersection, Casperson was two car lengths north of the rear of his 38-foot bus.

Following the accident Mrs. Hopkins continued on the bus to her destination. Upon her arrival at home she complained of neck and shoulder pain, headache, and her left hand was numb. The night of the occurrence she went to St. Joseph Hospital, where she was examined by Dr. Cannon; X-rays were taken. She remained in the hospital for ten days undergoing traction treatments to her neck and taking medicine for pain and as muscle relaxants. She was fitted with a Thomas collar which she wore regularly up to the time of trial. Dr. Cannon testified that upon his initial examination he found Mrs. Hopkins to have limitation of the motion of her neck, that her left shoulder area was tender and there was limitation of movement over the acromioclavicular joint which was strained and sprained. His original diagnosis was sprain of the cervical spine, partial separation of the acromioclavicular joint, contusion of the left knee and some straightening of the cervical lordosis due to muscle spasm. Dr. Cannon treated Mrs. Hopkins every week after her release up to June of 1961. During April of 1961 he sent her to the hospital on four to six occasions as an outpatient so she could receive diathermy treatments. He saw her again in December of 1961, and then again in January of 1963. Ten months after the accident there was still some reversal of the lordotic curve and a narrowing of the fifth and sixth cervical interspace. It was his opinion there was some injury to the joint space at C5 to C6

and he advised her to mobilize her neck as much as possible. He felt she should continue to use the Thomas collar, that she could not very easily sit for a long period of time and type, and that she would need treatment in the future which might possibly include an operation to remove the cartilage between the joint so as to relieve the pressure on the nerves. He felt she would continue to have pain.

Dr. Barnhill first examined the plaintiff in June of 1962. He saw her every day or two for a month, then twice a week, and at the date of trial (October 12, 1962) was seeing her once a month. In all he had treated her for seven months, seeing her a total of 27 times. He found muscle spasm of the neck muscles and X-rays he read showed a very marked reversal of the normal lordotic curve. His diagnosis was cephalea (headaches), traumatic myofibrocitis of the upper dorsal area, emotional disturbance caused by pain and generalized debility secondary to trauma. He also found an injury to the disc between C5 and C6 and a narrowing of this interspace and limitation of motion of her head and neck. He prescribed analgesics and muscle relaxants and advised the use of traction equipment in her home. It was his opinion she would need treatment in the future and will continue to suffer great pain. He found that her condition was permanent. He testified that Mrs. Hopkins is "very, very noticeably" affected by changes in the weather and would be unable to work as a stenographer or typist. He stated that if she did not improve, alternative treatment was a discography fusion operation.

Another doctor, a radiologist, testified that the X-rays he took showed an abnormal curve in the cervical spine. The defendants' medical witness also testified that he found some straightening of the two lower cervical vertebrae.

Prior to the occurrence Mrs. Hopkins was employed as a payroll auditor at a salary of $275 per month. She was 32 years of age and had no prior injuries. She had some help at home during the day while she worked to take care of her younger children, but she did her own housework. She had been very active; bowling, swimming, and taking part in scouting activities as well as other family interests. Following her release from the hospital she used a traction device at home every night for six months. At the time of trial she continued to have headaches and takes medication for sleeplessness and nervousness. She has limited motion of her head but cannot move her head or neck at all without pain of some kind. She wears the Thomas collar most of every day. Most of her household duties have had to be taken over by domestic help and her family. She can only drive an automobile by turning her entire body instead of only her head and neck. She has curtailed her family and social activity except that she does swim with her collar on. She returned to work after four and one-half months. Because some of the fingers on her left hand were numb she had difficulty typing. She continued working but only on an irregular basis due to her condition. She finally lost her job due to absenteeism. From the date of the accident to the date of trial in 1962 she lost $4,812 in wages. As previously stated, she is unable to work as a stenographer or secretary or at any work which requires her to sit down and use her hand.

Mr. Hopkins testified that to date of trial the medical bills he had received totaled $1,482.94 and that he had been required to expend $400 for domestic help.

Instruction No. 1, not in issue in this appeal, was Mrs. Hopkins' verdict-directing instruction against Casperson. Instruction No. 2, Mrs. Hopkins' verdict-directing instruction against the defendant, first required the jury to find that when the bus was about five to ten feet into the intersection Casperson was then so close to the intersection and was traveling at such a rate of speed that there was danger of a collision between them and the automobile. The next paragraph of the instruction reads as follows: "If you then find from the evi-

dence that the bus driver by the exercise of the highest degree of care on his part, should have discovered and realized that such danger of a collision existed, in time thereafter for the bus driver, in the exercise of the highest degree of care on his part and with safety to himself and others, either to have stopped the bus or to have slackened its speed and turned to his right, and that by doing either of those things he could, by the exercise of the highest degree of care, have avoided the collision but failed to do so, * * *." The balance of the instruction requiring the jury to find such conduct negligence is not pertinent to the allegations of error raised by the defendant.

Instruction No. 5 informed the jury that if they found for Mrs. Hopkins and against Casperson under Instruction No. 1 and also found for her and against the defendant under Instruction No. 2, then they were to return a verdict in her favor against both even if they found one more negligent than the other.

Instruction No. 6 informed the jury that if they found for Mrs. Hopkins and against Casperson under Instruction No. 1 and further found that Mr. Hopkins " * * * incurred expenses for the treatment and care of the injuries, if any, suffered by her in said collision, * * *" then they should return a verdict in his favor on his separate cause of action against Casperson. In its second paragraph this instruction informed the jury in the same manner should they find against the defendant under Instruction No. 2. The final portion of this instruction told the jury that if they found in favor of Mr. Hopkins and against both Casperson and the defendant, then their verdict should be against both even if they found one more negligent than the other.

▪ The defendant assigns four reasons to support its contention that the giving of Instruction No. 2 constituted prejudicial error. The first of these is that there was no substantial evidence in the entire case that the collision could have been avoided by slackening the speed of the bus and turning it to the right when the bus was five to to ten feet into the intersection. The argument made in support of this contention is based solely upon the defendant's contention that the only evidence on this issue comes from the bus driver who testified he could not turn to the right. This evidence is in keeping with the defendant's theory that only by turning right into Kingshighway could the collision have been avoided and that an automobile in the curb lane in front of the bus and the pedestrians crossing Kingshighway prevented the driver from so turning. As stated earlier herein the driver did testify that there was an automobile in the curb lane in front of the bus. However, there is plenty of evidence otherwise. Casperson denied there was an automobile in front of the bus; Stock said there was none and so did his daughter. In addition, there was ample evidence from which the jury could find the collision could have been avoided by slackening the speed of the bus and turning to its right without harm to others even if the pedestrians were to the right of the bus. The defendant's driver said he pulled out around the car he testified was ahead of him and straightening out proceeded across the east half of Kingshighway with the left side of the bus two to four feet from Manchester. The bus was 8½ feet wide and Manchester was 62 feet wide. Therefore the right side of the bus was 19 or 20 feet from the north curb line of Manchester. There was at least one lane open to the right of the bus into which it could have turned to avoid the collision without leaving Manchester.

▪▪ Not only was there a place to turn to the right but there is evidence from which the jury could find that the bus could have slackened its speed. The danger of a collision arose shortly after the bus entered the intersection. The bus was then moving at about five miles per hour and the driver testified his stopping distance at that speed would be eight to twelve feet. The bus was then at least thirty feet east of the point of impact and, as just stated, had an open lane

to its right on Manchester. This evidence is sufficient to allow the jury to reason that the company's operator, in the exercise of the highest degree of care on his part and with safety to himself and others, could have slackened the speed of his bus and turned it to the right so as to avoid the collision. The evidence that the bus could stop allows such an inference to be drawn. Nored v. St. Louis Public Service Co., Mo., 319 S.W.2d 608, l. c. 611 at [3]; Wilson v. Tonsing, Mo., 375 S.W.2d 140, at 143–144.

The defendant next contends Instruction No. 2 should not have been given because it, to quote from its brief, " * * * improperly placed an absolute duty on this defendant to stop or slacken and turn regardless of the circumstances then and there existing and by so doing, said instruction failed to hypothesize any facts for the jury to consider and became a roving commission to the jury." The defendants' argument is threefold. First, it urges that there were not sufficient facts submitted in the instruction; second, that the instruction improperly excluded certain facts and also failed to include certain other facts; and that the instruction constituted a roving commission to the jury.

■ With regard to defendants' first contention, the plaintiff's theory as to how this collision occurred differed greatly from the defendants' theory. However, it is evident that there was no controversy but that Casperson's speed and the slippery streets combined so that Casperson created a hazard while he was still a distance from the intersection. Instruction No. 2 submitted that when the bus had reached a point five to ten feet into the intersection, Casperson was then so close and traveling at such a rate of speed that the danger of a collision then arose. The defendant contends that it was necessary for this instruction to have hypothesized Casperson's speed in miles per hour and his distance in feet. We cannot agree. In LeGrand v. U-Drive-It Co., Mo., 247 S.W.2d 706, defendant's contributory negligence instruction sub-

mitted that plaintiff moved into the path of defendant's automobile when it was so close that the collision could not possibly have been avoided. In Sullivan v. Union Electric Light & Power Co., 331 Mo. 1065, 56 S.W. 2d 97, plaintiff's instruction that the jury should find for the plaintiff if they found the defendant's driver drove his truck across the path of the automobile in which plaintiff's deceased husband was riding while that automobile was so close and traveling so fast that to do so created danger of a collision. See also Barnes v. Vandergrift, 364 Mo. 829, 269 S.W.2d 13; Lincoln v. Railway Exp. Agency, Inc., Mo., 359 S.W.2d 759, and Brooks v. St. Louis Public Service Co., Mo., 275 S.W.2d 252. Under the facts of this case all that was necessary to submit to the jury was that they be required to find that the defendant driver moved out into the intersection at a time when Casperson's automobile was so close and approaching at such a speed that it was impossible to avoid a collision.

■ Defendant also contends that the instruction improperly excluded certain facts from the jury's consideration because the phrase "all the facts and circumstances shown in evidence" (see Arditi v. Brooks Erection Co., Mo., 266 S.W.2d 556) was omitted. While it may be proper to include this phrase in some cases, failure to include it does not exclude all of the facts and circumstances in evidence as defendant contends. The instruction opened by requiring the jury to find the hypothesizations therein "from the evidence," and proceeded to submit plaintiff's theory. There is no requirement that this instruction contain hypothesizations negating facts and circumstances not essential to plaintiff's theory. It was the defendant's duty to request an instruction submitting its defensive theory. Arditi v. Brooks Erection Co., supra. The defendant urges that this instruction improperly omitted to hypothesize the facts of the snow on the streets and the angle of the intersection. Since there was no dispute as to these facts, it was not necessary to submit them.

■ The defendant then argues that the instruction placed an absolute duty upon the defendant's driver to stop or turn and therefore "said instruction became a roving commission and it was error to give such." In support of this contention defendant cites Welcome v. Braun, Mo., 319 S.W.2d 586, at 589. There is no similarity between the instruction involved in that case and this instruction. The only reference to the driver's duty in the instruction in Welcome v. Braun, supra, was in the first paragraph. This did not, the opinion held, correctly limit the hypothesized acts committed by the defendant to the exercise of the highest degree of care. This instruction contains repeated limitations of the driver's duty to the exercise of the highest degree of care. These are so placed in the instruction as to tell the jury in plain language that the defendant was required to use the highest degree of care in doing the hypothesized acts. The clear language of this instruction and the repeated limitation of the defendant driver's duty by the use of the phrase "the highest degree of care" prevents this instruction from being interpreted as holding the driver to an absolute duty to stop or to slacken speed and turn.

■ The defendant then contends that Instruction No. 2 was erroneously given because there was no substantial evidence from which the jury could find that when the bus was five to ten feet into the intersection Casperson was then so close and was traveling at such a rate of speed that there was danger of a collision. Again the defendant has disregarded the evidence most favorable to the plaintiff. The defendant refers to Mr. Hutchinson's evidence that when the bus was five to ten feet into the intersection Casperson was six car lengths or 90 feet away. The defendant says that Casperson testified he could stop within 80 to 100 feet at twenty miles per hour. The evidence was that Casperson could stop in 80 to 100 feet at twenty miles per hour only after he got his foot on the brake. The question that was asked expressly asked Casperson to give his stopping distance, " * * * after you got your foot on the brakes and applied them." Casperson testified that his reaction time would extend his stopping distance to 122 to 130 feet at twenty miles per hour. It follows that even taking Casperson's speed at twenty miles per hour and even if the undisputed slippery condition of the streets is ignored, there was substantial evidence from which the jury could find there was danger of a collision when the bus was five to ten feet into the intersection. It should also be noted that there was evidence that Casperson's speed was 30 to 35 miles per hour.

■ The last attack upon this instruction is that it erroneously assumes the disputed fact that there was danger of a collision when the bus was five to ten feet into the intersection. In this connection the defendant refers to that portion of the instruction set out earlier herein requiring the jury to find that the bus driver, by the exercise of the highest degree of care, should have discovered " * * * that such danger of a collision existed." Defendant overlooks the fact that the first paragraph of this instruction required the jury to find that there was danger of a collision when the bus was five to ten feet into the intersection. The subsequent assumption of a fact previously hypothesized in an instruction is not error. Elgin v. Kroger Grocery & Baking Co., 357 Mo. 19, 206 S.W.2d 501, (15); Brinkley v. United Biscuit Co. of America, 349 Mo. 1227, 164 S.W.2d 325, (10).

■ The assigned error with respect to the giving of Instructions No. 5 and 6 is that these instructions erroneously assumed the disputed fact of defendant's negligence. The contention is that these instructions fall into the same category as the concurrent negligence instruction given in Watt v. St. Louis Public Service Co., Mo., 354 S.W.2d 889. The erroneous instruction there involved told the jury that if the negligence of both defendants concurred to cause

plaintiff's injury both would be liable. There was no reference made to other instructions which required a finding of negligence. In the first place, the clear and unambiguous wording of Instruction No. 5 presents a vastly different situation from that found in the Watt case. Instruction No. 5 directs a verdict against both the defendant and Casperson if, and only if, they found against Casperson under Instruction No. 1 and against the defendant under Instruction No. 2. The same is true of Instruction No. 6. There too the jury was informed that if, and only if, they found a verdict under other instructions for plaintiff and against both defendants were they to award their verdict against both Casperson and the defendant under that instruction. No one could read Instructions No. 1, 2, 5 and 6 and conclude, as defendant contends, the court was telling the jury both defendants were negligent.

The last allegation of error is that the verdicts are so excessive as to indicate passion and prejudice on the part of the jury and to require either a new trial or a substantial remittitur. We cannot agree that these verdicts require our interference. Mrs. Hopkins, age 32, has a permanent injury to her neck which has been and will be very painful. She is compelled to wear a Thomas collar but while that helps, it does not cure her. As of trial in January, 1963, she had lost $4,812 in wages. Medical and household expenses arising from her injury totaled $1,882.94 at time of trial. She will need future treatment and possibly hospitalization and an operation. In view of the whole record we cannot find a verdict of $15,000 for Mrs. Hopkins and $4,000 for her husband so grossly excessive as to constitute proof of passion and prejudice upon the part of the jury as to require a new trial.

Based upon certain cases which it cites, the defendant alternatively urges that a verdict of $7,500 for Mrs. Hopkins and $2,500 for her husband would be proper to maintain reasonable uniformity of the awards in such cases and urges that we order remittiturs to accomplish this result. Defendant cites Crosby v. St. Louis County Cab Co., Mo.App., 320 S.W.2d 944, where this court held a verdict of $3,500 was not excessive. In that case the plaintiff's medical expenses totaled $327.50. The plaintiff lost one week from work. Future treatments, if needed, were to be heat treatments. There was no sign of disc injury or straightening of the spine. In addition to all of these distinguishing factors the case is not authority that the amount of the verdict therein is the maximum we would approve.

Defendant refers to Miller v. Multiplex Faucet Co., Mo., 315 S.W.2d 224 and Carpentier v. Middlewest Freightways, Mo., 259 S.W.2d 816. We have examined the injuries in the Miller case and do not believe the situation analogous. Carpentier presents a factual situation more similar but, although the court affirmed the trial court which had reduced a $20,000 verdict to $9,000, it clearly indicated that had the trial court not done so it would have affirmed the original verdict.

In Riggs v. Metcalf, Mo., 315 S. W.2d 791, a case where the treatment was very similar to that in the instant case, a verdict of $20,000 was sustained. See also Appelhans v. Goldman, Mo., 349 S.W.2d 204, and Pyles v. St. Louis Public Service Co., Mo., 372 S.W.2d 114. In connection with the verdict for Mr. Hopkins, Riggs v. Metcalf, supra, involved an award of $2,500 for the husband where hospital and medical bills exceeded $1,000. In the instant case post-medical expenses alone total almost twice that involved in Riggs. In Gooch v. Avsco, Inc., Mo., 340 S.W.2d 665, a husband's verdict of $13,500 for medical treatment for his wife costing $2,250 was upheld. The case involved a "whiplash" type of injury requiring the removal of a disc. This is not to imply that the husband's verdict in this type of case is to be limited or reviewed only on the basis of the medical expenses incurred. However, in the instant

case, the fact that Mr. Hopkins' award was only some $2,118 over the amount he was out of pocket at the time of trial is some indication the jury's action was not so completely the result of bias and passion as to require our interference. Especially is this true in view of Mrs. Hopkins' inability to participate in family activities, her need for domestic help, and the possibility of future demands upon Mr. Hopkins for her medical treatment.

The judgment should be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of this court. The judgment is affirmed.

WOLFE, Acting P. J., ANDERSON, J., and DOUGLAS W. GREENE, Special Judge, concur.

RUDDY, J., not participating.