Cecil Eugene MURPHY, Appellant,

v.

Zella Mae MURPHY, Respondent.

No. 49005.

Supreme Court of Missouri,

Division No. 1.

July 16, 1962.

Delton L. Houtchens, Clinton, for appellant.

Poague, Brock & Wall, Barkley M. Brock, Clinton, for respondent.

HOLMAN, Commissioner.

In this case plaintiff filed a petition in the nature of writ of error coram nobis in which he sought to set aside a judgment and decree entered on April 6, 1960, in which defendant (plaintiff therein) was granted a divorce from him and also obtained a judgment for $18,000 alimony in gross and a support allowance for a minor child. The ground relied upon for setting aside the judgment was that plaintiff was suffering from a "mental condition" (it may be inferred that he was alleged to be mentally incompetent) at the time of trial and that no guardian ad litem was appointed for him and hence he was "deprived of a defense by a sane person." Just prior to the beginning of the trial of the instant case Wanda Wilson was appointed next friend and guardian ad litem for plaintiff. The trial court found the issues in favor of defendant and a judgment was entered denying plaintiff the relief he sought. Plaintiff has appealed.

Plaintiff and defendant were married October 12, 1928, and lived all of their married life on a farm near Deepwater, Missouri. They had four children who ranged in ages from 20 to 27 years at trial time. Plaintiff was a successful farmer and at the time the divorce case was tried owned approximately 500 acres of land, a large number of cattle, and valuable farm equipment.

Defendant (called as a witness by plaintiff) testified that plaintiff had always had a high temper and would have "temper fits"; that he had had disagreements and difficulties with his father and with his sisters and other relatives; that he had threatened people with a gun and had also threatened to take his own life; that he had abused her and the children over a period of years and insisted on dominating the family, and as the children grew older they rebelled against the attitude of their father; that in the summer of 1957 he became violent and had crying spells and "I just couldn't take any more of it. I left the place." Plaintiff then went to the hospital in Clinton and Dr. Bradshaw treated him for a while and then sent him to the Neurological Hospital in Kansas City. Defendant further testified that after plaintiff had spent about a month in that hospital Dr. O'Hearne, a psychiatrist in Kansas City, had recommended to her that she sign papers and have him sent to the State Hospital at Nevada for treatment; that he was taken to the hospital early in August and while there improved a great deal; that after his release (October 30, 1957) they resumed living together and plaintiff was easier to get along with and "fitted in with the family a little better than he had before"; that in the fall of 1959 (1958?) his conduct became worse and "we just couldn't please him, he would get morose and wanted to dominate everybody"; that she left the defendant in February 1959 and filed the suit for divorce in October 1959.

The records of the Probate Court of Henry County indicate that on August 1, 1957, Mrs. Murphy signed a petition for an order of involuntary hospitalization alleging that her husband was mentally ill; that on that date an order for temporary confinement was made by the court; that on

August 15 a hearing was had on the petition and the court found that Mr. Murphy suffered from a mental condition and was in need of care and treatment at a mental institution, and ordered that he be hospitalized in the State Hospital at Nevada, Missouri "for an indefinite and indeterminate period until the mental condition of said proposed patient shall be sufficiently improved to warrant release." No guardian was ever appointed for plaintiff and no restoration petition was filed in the Probate Court of Henry County.

Plaintiff also read in evidence the deposition of Dr. Paul L. Barone who testified that he had worked at the State Hospital at Nevada for 21 years and had been superintendent thereof since January 1948. This witness identified the records of the hospital relating to Mr. Murphy. He also testified that at a staff meeting of five doctors, only one of the doctors expressed the opinion that Mr. Murphy was psychotic or mentally ill. One of the doctors said he was a psychoneurotic, and three diagnosed his condition as "personality trait disturbance, passive-aggressive personality"; that in his opinion a person suffering from passive-aggressive trait disturbance could work, manage his own business, and operate a farm. He stated that Mr. Murphy was a good patient and the only treatment administered was occupational and recreational therapy and the use of tranquilizing drugs; that he was in an open ward and could go about the grounds at will; that he was given convalescent leave on October 30, 1957, at which time "I thought he was normal, capable of carrying on his ordinary business from then on"; that he was finally discharged (without having returned to the hospital) on August 18, 1958, and the Probate Court of Henry County was notified of that action.

The files of the State Hospital contain a letter dated July 22, 1957, from Dr. John J. O'Hearne of Kansas City which states that he had examined Mr. Murphy and that his diagnosis was "involutional psychotic reaction with paranoid trends and moderate agitated depression," and he recommended hospitalization in the State Hospital for a period of at least two or three months.

Plaintiff called as an expert witness Dr. Nathan Greenbaum who testified that he was a psychologist practicing in Kansas City, Missouri. He testified that he had examined the plaintiff on April 20, 1961, in his office in Kansas City; that in his opinion plaintiff was suffering from a chronic mental illness which he diagnosed as paranoid; that plaintiff had a persecution complex and entertained unjustified suspicions; that this condition had existed for at least four years and probably longer; that in his opinion plaintiff had not been competent to defend the divorce case in March 1960 because, while he may have been competent in many matters, anything connected with his wife would trigger his paranoid thinking and that such "thinking would be distorted and impaired"; that in his opinion plaintiff was not competent to testify in the case on trial. On cross-examination this witness expressed the opinion that plaintiff understood about his property and its value.

Mrs. Wanda Wilson, plaintiff's niece and guardian ad litem, testified that since 1957 plaintiff had kept more to himself, didn't trust anyone, and had unjustifiably accused his wife of infidelity; that his condition had not improved and he continued to have delusions. On cross-examination this witness stated that plaintiff had always been possessed of a high temper, and that he was at that time handling his farms and other property.

Floyd Sperry, Jr., testified that he was a practicing attorney in Clinton, Missouri, and was at that time holding the office of prosecuting attorney; that plaintiff had employed him to act as his attorney in the defense of the divorce case and that he had fulfilled that employment; that while the divorce suit was pending plaintiff had conducted a cattle sale under an agreement with his wife to sell the cattle and pay the proceeds on a mortgage at the bank; that plaintiff was present during the trial of the

divorce case and testified at some length in connection with the issues on trial; that two or three other witnesses were called on behalf of plaintiff (defendant therein) and that he had presented all of the evidence available in defending said case; that he did not know of the order of the probate court in regard to Mr. Murphy's mental illness but did know that he had been in the two hospitals and that plaintiff had so testified in the trial of the divorce case; that after the decree he had filed a motion for new trial which was overruled; and he thereafter filed a motion to quash a levy made under an execution in favor of Mrs. Murphy seeking to collect the $18,000 judgment; that shortly thereafter he had been relieved as attorney for Mr. Murphy.

All of the evidence heretofore detailed was offered by plaintiff. The only evidence offered by defendant was a transcript of the testimony of Mr. Murphy in the divorce case, which transcript was admitted without objection on the part of plaintiff.

█ The rule in this state is that an insane person may be sued "but he must have the right and benefit of a defense made by a sane person (either himself recovered, or a guardian)." Gibson v. Pollock, 179 Mo.App. 188, 166 S.W. 874, 875. If no guardian has been appointed the court, upon proper suggestion, should appoint a guardian ad litem to defend in the name of the insane person. Graves v. Graves, 255 Mo. 468, 164 S.W. 496. A judgment rendered against an insane person who is not represented by a guardian or guardian ad litem is voidable and in a proper proceeding should be set aside. If the fact of insanity did not appear upon the face of the record it is clear that a proceeding in the nature of writ of error coram nobis is an appropriate remedy to set aside the judgment. Bank of Skidmore v. Ripley, Mo.App., 84 S.W.2d 185; Graves v. Graves, supra.

█ In a case of this nature it is our duty to review the case de novo, weigh the com-

petent evidence, and reach our own conclusions as to the facts, but "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Section 510.310(4) (unless otherwise indicated all statutory references are to RSMo 1959, V.A.M.S.). The facts heretofore stated indicate that there was ample evidence to support the finding of the trial court in favor of defendant. While we are willing to defer to the trial court our de novo review of the evidence has caused us to independently arrive at the same conclusion.

█ In his brief plaintiff assumes that he has been adjudged by the probate court to be incompetent or of unsound mind. He goes further and says that since there has been no restoration order that condition is presumed to have continued until the present time which would, of course, include the date of the trial of the divorce case. This contention is not factually correct. He was not adjudged to be of unsound mind. The proceeding was held under the provisions of § 202.807, a relatively new statute, which provides for involuntary hospitalization of certain persons who are mentally ill. It is specified in subsection 5 that "if, upon completion of the hearing and consideration of the record, the court finds that the proposed patient is mentally ill, and is in need of custody, care or treatment in a mental hospital and, because of his illness, lacks sufficient insight or capacity to make responsible decisions with respect to his hospitalization, it shall order his hospitalization for an indeterminate period or for a temporary observational period not exceeding six months; otherwise it shall dismiss the proceedings." That such an order is not an adjudication of insanity appears from the provisions of § 202.780(5) wherein "mentally ill individual" is defined as "an individual having a psychiatric or other disease which substantially impairs his mental health who may or may not be legally insane," and from § 202.847, which recognizes the right of patients subject to judicial hospitalization to exercise civil

rights "unless he has been adjudicated incompetent and has not been restored to legal capacity." The restoration proceedings provided for in § 475.360 do not apply in proceedings for judicial hospitalization, for that section applies to persons "adjudged to be incompetent or of unsound mind." Patients hospitalized under § 202.807 may at any time petition for re-examination of the order for hospitalization under the procedure prescribed by § 202.837 and if found no longer mentally ill and no longer in need of custody, care or treatment in a mental hospital, they are entitled to be released. See 5 Maus, Missouri Practice, § 1868, p. 238.

The cases holding that an adjudication of insanity usually gives rise to a presumption of continued incapacity are not specifically applicable in this situation. The most that could be here said is that there is a presumption that plaintiff continued to have some sort of mental illness after the adjudication in question. However, we deem it unnecessary to decide that question as such a presumption would be of little or no consequence in view of the evidence that plaintiff was released from the hospital on October 30, 1957, resumed his normal way of life, and was discharged "from the hospital records" in August 1958.

The evidence has been heretofore stated in detail and need not be restated in our discussion of the basis for our decision. We consider it sufficient to briefly refer to a few items which we have considered particularly convincing in arriving at the conclusion that plaintiff was not insane and was mentally able to defend the divorce suit. (1) Four of the five staff members at the State Hospital were of the opinion that plaintiff was not mentally ill. (2) He was not restrained at the hospital and was given very moderate or mild treatment. (3) Upon his release after a few weeks Dr. Barone was of the opinion that he was normal and capable of handling his business affairs. (4) He employed an attorney in the divorce case who apparently made a thorough defense. (5) Plaintiff testified at length in that case (34 transcript pages) which testimony apparently covered all issues in the case. In our review of that testimony we find nothing therein to indicate that plaintiff was not in full possession of his mental faculties. (6) The evidence indicates that from October 30, 1957, until the date of the trial (April 26, 1961) plaintiff had been able to manage his personal and business affairs.

We have carefully considered certain opinion evidence which would indicate that plaintiff was suffering from a serious mental disease at the time of the trial of the divorce case and thus was incapable of presenting his defense therein. However, in our opinion, that evidence is strongly outweighed by evidence to the contrary and hence is not convincing.

The judgment is affirmed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.