In re M————————.

No. 8388.

Springfield Court of Appeals.

Missouri.

June 29, 1965.

Rehearing Denied July 21, 1965.

George C. Baldridge, Joplin, for appellant.

Dean Johnston, Dalton DeShazer, Joplin, for respondent.

PER CURIAM.

█ This is a proceeding under Sections 211.441 to 211.511, RSMo (1959), V.A.M.S., in which the State sought to terminate the parental rights of the two defendants (now divorced) with reference to their five minor children ranging in age from 6 to 16 years at trial time. The trial court has entered a decree terminating the parental rights of both parents; the father alone has appealed, and we shall refer to him as the defendant. The cause is before us for review de novo, and, although we may not set aside the judgment unless it is clearly erroneous, it is our duty to make our own independent findings of fact and reach our own conclusions of law. Rule 73.01(d);[1] Renfro v. Jackson County Juvenile Court, Mo.App., 369 S.W.2d 616, 621[5, 6].

The action was begun by the filing of a petition by the Jasper County Juvenile Officer which, after reciting the names and ages of the parents and their children and alleging that the children were in the custody of the Juvenile Court, then stated as grounds for termination substantially all the reasons or grounds provided in Section 211.441. Among other things, the petition specifically alleges that " * * * the parents have been found incapable *and incompetent* and there are reasonable grounds to believe that they will continue to be incapable of giving the children necessary care and protection. * * *" The defendant filed a responsive pleading, answering the juvenile officer's petition and praying that custody of the children be restored to him; in turn, the juvenile officer replied to this responsive pleading, specifically setting forth that " * * * said [defendant] is

1. All references to statutes and rules are to RSMo. (1959), V.A.M.S. and V.A.M.R., unless otherwise noted.

presently suffering and for a long time in the past has suffered from a mental disorder diagnosed as manic depressive reaction, manic type; that he becomes abusive and violent and strikes and abuses said children inflicting severe bodily injuries to them; that such assaults upon said children have been frequent and severe while said children were in his custody and that it would be extremely dangerous to said children to permit him to have custody of them and detrimental to their interests, moral, mental and physical."

At trial time, the father was 45 years old and the mother was 38. They were married December 22, 1944, and are the parents of two girls, one 16 and the other about 6, and three boys, 15, 14 and 7. The mother was served by publication and did not appear at the trial. The State introduced a letter purportedly from her in which she advised the juvenile officer that she " * * * [had] given this [litigation] quite a bit of thought and I believe they would be better off in someone else's homes. So this is my authority for you to adopt them or whatever is best for them. * * *"

The State's proof was voluminous, and we will attempt here to present only a few of the incidents which were developed on the trial. One of these occurred while the defendant and his family were living in Coffeyville, Kansas, in 1960. Early in August 1960, the defendant reported to the Coffeyville authorities that his wife had been missing since July 27. The defendant stated to one of the officers that his wife was a "highly nervous woman," and that she had left without giving any indication where she was going. A police investigation of the woman's disappearance revealed that she and the defendant had quarreled on numerous occasions prior to her departure, and that they had quarreled violently shortly before she left. The neighbors appear to have been reluctant to discuss the matter, because they considered the defendant to be a physically violent man and they were afraid of him. Apparently the Coffeyville

authorities took the matter seriously, for, in the language of the county attorney, "we drug ponds and rivers," but the search was unproductive.

Where the wife went at this time, and her reasons for going, are somewhat obscure. Her conversations with the county attorney indicated that she had left home because she received a severe beating from the defendant, and that she went to Cincinnati where she worked in a children's home. The defendant seems to believe that she was guilty of infidelity of some kind, and at one point in his trial testimony he accused his wife of living with a paramour during her absence, which extended over a period of some eight months. His explanation of his wife's behavior is typical of his testimony upon the trial.

"Q. * * * when you married your wife back in 1944, will you describe any defect * * * she had about her face?

A. Yes, she had a very badly deformed nose. In fact, it was so bad that, I liked her, but yet, I was ashamed of her.

*   *   *   *   *   *

Q. * * * What happened about your wife's face in about 1959?

A. * * * through the years her nose * * * seemed to get worse. Her nose was very badly deformed. I was extremely ashamed of her.

Q. Would you say she was kind of an ugly duckling?

A. Yes, she was, but there was still something about her that I liked."

The defendant then related that his wife had undergone a plastic operation on her nose. His testimony continued:

"Q. What kind of results did the plastic surgery have?

A. The operation gave her the most beautiful nose and the most beautiful

face that I have ever seen. She was perfect.

Q. They did a good job?

\* \* \* \* \* \*

A. Yes, after that, naturally, she was about the most beautiful woman I ever laid my eyes on. I fell badly in love with her. From then on things were never the same. I don't know what it was, she developed an independence \* \* \* toward me, which I thought for the goodness that I had done and suggested that she had, why, it would always be different.

Q. What did she start doing?

A. Well, she started—she was getting independent, and then, she started paying a lot of attention to men and flirting with them.

\* \* \* \* \* \*

Q. She started having interest in other men. What happened after that \* \* \* ?

A. Well, it got worse and worse and she just plainly started running around with other men and it just got worse and worse."

In any event, the wife did not return until March 1961, and in the meantime the defendant was left with their five children, the youngest of whom was about two at the time. The eldest daughter C——, who was 13 then, undertook to do the housekeeping, and it was at this time that the "Crisco can" incident occurred.

As this episode was related by the children, the defendant and his eldest daughter had gone to do some marketing, and J——, one of the older boys, was left in charge. There was a carnival or fair in town, however, and J—— did not remain at his post. When J—— did return, the defendant struck him a number of times and, according to the eldest daughter, "pushed his head into a Crisco can." J——'s explanation was that "he [defendant] started to swing at me \* \* \* and I ducked

and hit the Crisco can." The defendant denied any brutality. J—— received a cut on his forehead which required treatment at a local hospital, and consequently the defendant was charged with assault upon his own child. When the defendant was tried for that offense, the children testified that J—— received his injury as the result of an accident, and the defendant was acquitted. On this trial, the children testified that the defendant had coached them in their testimony at that time and had threatened them with violence if they did not obey his instruction and testify that J—— received his injury as the result of an accident. In any event, J—— still has a visible scar over his right eye as a result of this incident.

For reasons not clearly shown, but apparently because of the repeated incidents involving physical violence inflicted upon his family, the defendant was committed to the Osawatomie State Hospital on September 29, 1960, for psychiatric examination and observation. Though the nature of the proceeding by which the defendant was committed is not apparent, it does appear that the defendant remained at Osawatomie for some three months, during which time he received electric shock therapy. Records produced at this trial show that the defendant was then classified as a manic-depressive psychotic, manic type. The defendant's description of his treatment in the hospital was that "I took shock treatments, which is about like setting you on fire with electricity, and that is what brought me out of this black out that I was in \* \* \*." The children were committed to the Kansas juvenile authorities and placed in foster homes, and upon the defendant's release from Osawatomie they were eventually returned to his custody.

In March 1961, the defendant's wife returned to the family home "because she missed the kids so much," and acting apparently upon the defendant's assurance that he would not mistreat her again. However, on April 14, the wife appeared in Coffeyville Memorial Hospital, severely beaten.

Photographs taken of the defendant mother at this time and introduced in evidence show extensive bruises about her head and face, but reveal no discernible defect scar or other post-operative mark upon her nose. The upshot of this incident was that on April 19, 1961, the defendant was convicted of assaulting his wife and was sentenced to serve one year. The wife testified at the trial that the beatings and violence had become a regular part of her life; according to the record evidence, she testified at that time that the defendant quite often beat her, knocked her to the floor and slapped her back and forth across the face, and that almost any trivial incident would provoke these attacks. The defendant would then become extremely remorseful and would lie upon the floor and cry. In this instance, the defendant did not altogether deny that he had become violent, but his version of this assault was that he had surprised his wife while she was conversing with her paramour over the telephone and that he " * * * finally lost control * * * and I reached out and grabbed her and put my hands at her throat and I shook her hard. * * *" The defendant was paroled after serving approximately two months of his one year sentence, and was recommitted when he again assaulted his wife, in public, early in September 1961. The defendant then remained incarcerated until February 1962, when he was again paroled. While the defendant was incarcerated, his wife finally obtained a divorce and was awarded custody of the children.

The day before the defendant received his second parole on February 3, 1962, his wife departed from Kansas and went to Arkansas, taking the children with her. Though again the record is not entirely clear, it seems that the defendant and his wife again became reconciled and removed to Jasper County, where they appeared sometime in March or April 1962. Here we lose track of the wife and mother. According to the defendant, she remained in the family home for a short time, de-

serted him, returned again, and again departed. All that the record shows with certainty concerning the mother, after the family settled in Jasper County, is that the defendant again assaulted her violently and was charged with and convicted of assault in municipal court at Joplin.

Since the family's arrival in Jasper County, the defendant has been involved in one episode after another arising out of some violent act inflicted upon some member of his own family or some other person, and he has, the evidence shows, shown most unconventional and erratic behavior toward members of the opposite sex. One of the more spectacular incidents presented by the State occurred on October 26 or 27, 1962, when the defendant had a "date" with a young married woman, described as being under 20 years of age. As the incident was related by C——, the defendant's eldest daughter, the defendant and the young woman appeared at the family home early in the evening with the young woman's baby. C—— was left in charge of the baby and the defendant and the young woman left to enjoy the evening. "Around 12 somewhere," the two returned to the defendant's home intoxicated, and the defendant refused to return the young woman to her home. The young woman, afraid that "mother [would] be worried," awoke C—— and requested permission to use an automobile. Locating the keys to the automobile, the young woman left. The defendant, aroused by her departure, became angry and inquired of C—— where the keys to the automobile were. Receiving no satisfactory response, and becoming thoroughly enraged, the defendant began striking his daughter with his fists, and finally struck her with a piece of a dresser which he had demolished looking for the keys. C—— was obliged to flee from the home and take refuge with neighbors. Photographs of C—— taken at the time indicate that her left eye was severely bruised and that her eyelid was cut. One of the neighbors stated that her face was bleeding shortly after the incident. It has been stipulated

that the defendant was convicted in municipal court of common assault upon his daughter, and that he pleaded guilty to that charge. Following this incident, the children were placed in a foster home by the Jasper County juvenile authorities.

On another occasion early in 1963, the defendant was observed driving north of Neosho, weaving back and forth across the center line, at approximately 1:00 A.M. He was stopped by a member of the State Highway Patrol, who testified that he smelled alcohol on the defendant's breath, and that the defendant's reason for his bad driving was that he was attempting to make love to his female companion while he was driving his automobile. In the course of his conversation with the trooper, the defendant became excited and threatened one of the juvenile authorities in Jasper County and the attorney who was representing him at the time. Neither were immediately involved in the traffic incident.

On another occasion, the defendant was "using bad language" in the presence of a young woman at a bar near Joplin and precipitated a fight with the young woman's companion. During the course of the fight, he threw a chair at one of the waitresses in the bar and injured her. A number of other such incidents were established by the State's evidence.

Though our independent review of this case has convinced us that the cause must be reversed and remanded, we wish to be perfectly clear in saying that we agree it is imperatively necessary that custody of all these children be and remain with some person or agency other than the defendant. Not only does some of the defendant's conduct—such as bringing his teen-age "date" into his home intoxicated—appear to be morally indefensible, but he has cruelly abused these children, and they are entitled to the intervention and protection of the State. Indeed, nothing else appearing in the record, this evidence would be amply sufficient to sustain the order terminating the defendant's parental rights.[2] Nor do we consider it desirable that the defendant be advised where the children are being kept or be granted visitation privileges at the present time. Such considerations are somewhat extraneous in this case, however, for these proceedings do not really involve urgent problems of custody or juvenile court supervision of the subject children; all that needs to be accomplished along those lines can be, and apparently has been, done under the provisions of Section 211.-181. It is pleaded that the children are and for some time have been wards of the juvenile court, and they can be made subject to the supervision of the juvenile court and taken from the custody of the defendant without termination of the defendant's parental rights.

Both the State and the defendant have argued the cause here upon the merits. The State argues that "the evidence shows without contradiction that [defendant] is suffering from a nervous disorder, and that the safety and lives of the children would be endangered if they were returned to appellant." The defendant's argument is that although he has "gone through terrific emotional, psychological, and physical problems * * * [he] has recovered." The parties' common ground is, and we agree, that during the period covered by the evidence there has been a pronounced cast of irrationality to much of the defendant's conduct. After showing outright brutality to his wife, for example, the defendant would be "very remorseful * * * and [would] lie on the floor and cry about it." The defendant's wife, in a letter to the juvenile officer, stated that "* * * I have known for 18 years that he [defendant] is definitely a mental case. * * *" The

2. In re Burgess, Mo.App., 359 S.W.2d 484, 494 [5]; In re Halamuda, 85 Cal.App.2d 219, 192 P.2d 781, 784–785; In re Miller, 40 Wash.2d 319, 242 P.2d 1016, 1018 [6, 7]; see Anno., 41 L.R.A.(N.S.) 564, 591–592 VII.

defendant's eldest daughter, in the course of her examination, was asked:

"Q. Do you feel that your father is mentally upset and disturbed?

A. Yes, I do. * * *

Q. Do you feel that he needs help of some kind?

A. Yes, I do."

The State's evidence also included proof that in 1960 the defendant was confined in a mental hospital for some three months, at which time he received electro-shock therapy, and proof by a qualified clinical psychologist that in December 1962 the defendant was a "severely emotionally disturbed individual who's [sic] judgment and reasoning are * * * impaired at this time. * * *" This same psychologist indicated that the defendant's disorder—if that is the proper term—is a "psycholeptic type of mental disorder. *It comes and it goes.*" (Our italics.) There are many other evidentiary details which, in the light of this evidence, indicate that the defendant is suffering from some kind of mental illness of considerable degree. The defendant himself testified that in May, June and July 1963, he was still receiving psychiatric treatment from a physician in Tulsa.

■ The question which presents itself, of course, is whether the defendant has really had his day in court. We think he has not, for want of a guardian ad litem or other representative, but we wish to be clear in stating our reasons, and as precise as possible in limiting our ruling. In the first place, the court is under no duty to inquire, initially, into the competency of the parties before it. Smith v. Rabb, 95 Ariz. 49, 386 P.2d 649, 654 [20, 21]; Engelbercht v. Davison, 204 Iowa 1394, 213 N.W.

225, 228 [6]; 44 C.J.S. Insane Persons § 143a, pp. 306–307. As the matter is usually put by our cases, e.g., Hemphill by and through Burns v. Hemphill, Mo., 316 S.W.2d 582, 586–587 [10, 11], there is a presumption of competency or sanity which obtains until evidence to the contrary appears. Nor do we suggest that mental illness automatically operates or would necessarily operate in this case to excuse the defendant from the consequences of his conduct. He has never been adjudicated an incompetent, within the meaning of Section 475.010, par. (3), and involuntary hospitalization and treatment for mental illness is not, under our law, an adjudication of technical or legal insanity, Williams v. Pyles, Mo., 363 S.W.2d 675, 678 [1]; Murphy v. Murphy, Mo., 358 S.W.2d 778, 781–782 [5]; the Kansas statutes under which this defendant was committed for treatment are very similar to our own. Our decisions also recognize that mental illness may co-exist with mental capacity.[3] On the other hand, if it affirmatively appears that a party to an action, not in ward, is mentally ill or incompetent, then the court should inquire into his mental condition for the purpose of the particular litigation, so a guardian ad litem or other representative may be appointed to protect his interests.[4] And we may observe that a guardian ad litem is not a mere figurehead, but is "required to take all steps reasonably necessary to protect and promote the interests of his ward in the litigation." Hemphill by and through Burns v. Hemphill, supra, 316 S.W.2d at 587 [12].

■ Statutes providing for the termination of parental rights, at least as they were originally conceived, look to a final and permanent settlement of all problems of custody and supervision by a complete and

---

3. McElroy v. Lynch, Mo., 232 S.W.2d 507, 514; Audrain County v. Muir, 297 Mo. 499, 511–512, 249 S.W. 383, 386 [8]; Forbis v. Forbis, Mo.App., 274 S.W.2d 800, 807 [22]. Cf. State ex rel. Standefer v. England, Mo.App., 328 S.W.2d 732, 736 [8].

4. Williams v. Pyles, supra, 363 S.W.2d at 678–679 [7–10]; Murphy v. Murphy, supra, 358 S.W.2d at 781 [2]; Graves v. Graves, 255 Mo. 468, 480–482, 164 S.W. 496, 500 [5, 6]; Bensieck v. Cook, 110 Mo. 173, 183, 19 S.W. 642, 644 [5]; 44 C.J.S. Insane Persons § 143a, pp. 306–307. See Anno., 71 A.L.R.2d 1247, 1260–1261, § 3 (1960).

final divestment of all legal rights, privileges, duties and obligations of the parent and child with respect to each other, and by replacement of the natural parent by another guardian or an adoptive parent.[5] They are not primarily designed, as we have indicated, to deal with imperative problems of immediate custody or supervision, In re Zimmerman, 206 Cal.App.2d 835, 24 Cal.Rptr. 329, 334 [2], nor are they punitive in their nature.[6] The finality of the proceedings and the high importance of procedural safeguards for the rights of the parents are expressed in the statutes.[7] Our examination of the legislative history and background of the termination statutes convinces us that, while it is not in terms required, the framers of these statutes contemplated that a guardian ad litem would be appointed for the parent if his (or her) incompetency positively appeared to the court.[8] It may also be appropriate to note that while a judgment rendered against an incompetent or insane person is not void,[9] it is voidable on direct attack,[10] and a judgment rendered against a mentally incompetent person, after suggestion of his incompetency and without the appointment of a guardian ad litem, "would smack of legal, if not actual, fraud." Graves v. Graves, supra, 255 Mo. at 483, 164 S.W. at 501.

We do not say that evidence of some past mental illness or emotional disorder on the part of one or another parent would always and inflexibly require the appointment of a guardian ad litem in a termination proceeding. Kennedy v. State Department of Pensions and Security, 277 Ala. 5, 166 So.2d 736, 739 [6]. This is not a case, however, in which the trial court might merely have suspected from the defendant's behavior, conduct or testimony that he was somewhat unbalanced, nor even a case in which there was simply evidence of past hospitalization, which might have raised some sort of presumption of continuing mental illness. Murphy v. Murphy, supra, 358 S.W.2d at 782. In this case, the State affirmatively pleaded in its petition that the defendant was incompetent, and the written social investigation and report required by Section 211.491 and filed by the juvenile officer suggested the defendant's erratic emotional condition and anti-social behavior, and appended a description of manic-depressive psychosis as a disease characterized by the very conduct of which the defendant was accused. In answering the defendant's responsive pleading, the State affirmatively alleged that the defendant was *"presently suffering * * * from*

---

5. U. S. Dept. of Health, Education and Welfare, Social Security Adm'n., Children's Bureau Pub. No. 394, Legislative Guides for the Termination of Parental Rights and Responsibilities, and the Adoption of Children, pp. 9–10, 19–20 (1961) (hereinafter cited as Guides). See note, Wis.Stat.Ann. § 48.43. Our statutes are drawn from the so-called "standard act" suggested by the Guides and the Wisconsin law. We acknowledge here the assistance of the General Assembly's Committee on Legislative Research.

6. See Guides, p. 9.

7. Section 211.511 provides that " * * * [t]he order [of termination] shall be conclusive and binding on all persons and in all proceedings after one year from the date of its entry." Section 211.441 requires that the grounds for termination be established by " * * * clear, cogent and convincing evidence * * * *"; Section 211.471 provides that the parents

are entitled to counsel upon the hearing; and Section 211.481 provides for a jury trial, if demanded in writing.

8. The termination statutes, as originally drafted for the 1957 session of the General Assembly, contained such a requirement. See also Guides, supra, n. 5, at 6, and the Wisconsin statute, W.S.A., § 48.42(2).

9. Williams v. Pyles, supra, 363 S.W.2d at 678 [2]; Annos., 140 A.L.R. 1336 I (1942); 34 A.L.R. 221 I (1925).

10. Williams v. Pyles, supra, 363 S.W.2d at 678 [4]; Murphy v. Murphy, supra, 358 S.W.2d at 781 [2]; Graves v. Graves, supra, 255 Mo. at 482–483, 164 S.W. at 501; Bank of Skidmore v. Ripley, Mo. App., 84 S.W.2d 185, 187 [2]; Gibson v. Pollock, 179 Mo.App. 188, 191, 166 S.W. 874, 875 [2–4]; Anno., 35 L.R.A. (N.S.) 1090, 1095–1097 VI (1912).

a mental disorder." (Our emphasis.) We consider these pleadings and this report a strong suggestion of mental disorder on the part of the defendant, if indeed the necessity for the appointment of a guardian ad litem depends upon affirmative suggestion—a proposition which we accept with some reserve.

The end result here is unsatisfactory, both from the viewpoint of the State and the defendant. We have no doubt that this family situation has created a social problem of the first magnitude for the responsible authorities who have had to deal with the defendant and his family. Apparently the defendant has not only neglected and abused his family, but has harassed and threatened the officers themselves in the performance of their duties, and we do not minimize the difficulties of the case from their standpoint. However, a judgment rendered upon so strong a suggestion and evidentiary indication of mental illness cannot have the attribute of finality which is desirable as far as the State is concerned and for which the statute calls. So far as the defendant is concerned, the State is exercising what has aptly been called an "admittedly awesome" power, In re Johnson, 9 Wis.2d 65, 100 N.W.2d 383, 390–391 [16], and he is entitled not only to every procedural safeguard for his rights as a parent, but to the right and benefit of a defense made by a competent person, "either himself recovered, or a guardian." Murphy v. Murphy, supra, 358 S.W.2d at 781 [1]; Gibson v. Pollock, supra, 179 Mo.App. at 191, 166 S.W. at 875 [3]. We therefore conclude that the decree must be reversed and remanded to the end that a guardian ad litem may be appointed, both to prevent injustice to the defendant and to the end that the State may obtain a final and permanent decree, if the evidence warrants it. Cf. Williams v. Pyles, supra, 363 S.W.2d at 678–679 [7–10]. It is so ordered.

All concur except STONE, J., not participating.