V_____ D. S_____,
**Plaintiff-Respondent,**

v.

W_____ E. S_____,
**Defendant-Appellant.**

**No. KCD26087.**

Missouri Court of Appeals,
Kansas City District.

Jan. 19, 1973.

Walter R. Simpson, Sheridan, Sanders, Carr, White & Mason, Kansas City, for defendant-appellant.

Austin F. Shute, Kansas City, for plaintiff-respondent.

Before DIXON, P. J., and CROSS, and SWOFFORD, JJ.

SWOFFORD, Judge.

This is an appeal from an order of the Circuit Court dated January 4, 1972, setting aside a decree of divorce granted to the plaintiff-respondent on January 11, 1971 (motion for reconsideration overruled February 4, 1972) and an order of February 4, 1972, awarding partial attorney's fees to her for legal services rendered by her attorney in connection with her motion to set aside the said divorce decree.

This motion of the plaintiff was based upon the alleged fact that at the time of the hearing of her divorce action, she was suffering from a severe mental illness; was under involuntary commitment to the Western Missouri Mental Health Center through the Jackson County Probate Court; was not mentally competent to make decisions affecting her action for divorce, including her waiver of alimony; that such matters were well known to all parties concerned with the divorce action, but were not disclosed to the trial judge, and that, thereby, a fraud was perpetrated on the court, requiring that the decree be set aside.

After a hearing on this motion, it was sustained and this appeal followed in proper form and in due course. The parties will be referred to as they were below.

The plaintiff and defendant were married December 27, 1959 and were separated October 6, 1970. Three children were born of the marriage and were aged 11, 9 and 7, at the time of the separation. The defendant was an employee of Western Electric Company on an hourly wage, and the plaintiff at the times pertinent here was not employed, although she had formerly worked as a cashier and retail saleslady.

The record before us shows that the plaintiff had suffered at intervals since 1967 with various forms of emotional and mental illness and had from time to time received both inpatient and outpatient care and therapy at facilities of the state, primarily the Western Mental Health Center at Kansas City, hereinafter referred to as "Western". She had been given both group and individual therapy, attempts at vocational rehabilitation, and she and the defendant had received marriage counseling. She had never been adjudicated incompetent under the law. Without belaboring this rather sordid picture of social, mental and marital difficulties, for the present purpose it should be stated that the record shows that on September 23, 1970, by order of the Probate Court of Jackson County, Missouri, she was placed in Western for involuntary hospitalization under the provisions of Section 202.807 V.A.M.S. The application for this order was made by the defendant and apparently at that time they were both represented by counsel.

The staff at Western concluded that her diagnosis was "Paranoid-Schizophrenic" and that this mental illness stemmed in large part from her marital situation, and that she should be separated or divorced from her husband, the defendant. Following this advice and with the assistance of members of the Western staff and of her sister, she employed the firm of Blumer, Wright, Bittiker and Rocha to represent her. Mr. Rocha of that firm handled the matter. The defendant was represented by Mr. Walter R. Simpson of the firm of Sheridan, Sanders, Carr, White and Mason.

On October 5, 1970, the plaintiff was released from Western where she had been undergoing individual therapy under the involuntary hospitalization order of the Probate Court. The exact nature of this release is somewhat obscure, but the defendant's counsel and plaintiff's sister were under the impression that it was final release, although under the procedures at Western it was probably a release on Trial Visit status.

On October 7, 1970, the plaintiff filed her action for divorce against the defendant. On November 10, 1970, the defendant filed his answer and cross-petition, and on that same day the plaintiff filed her reply.

The record discloses that a period of arm's-length negotiations between counsel

and the parties ensued, which culminated in a property settlement agreement (P. Exh. No. 1) executed by the parties and witnessed by their respective counsel. The basic provisions of this agreement provided that the plaintiff was to receive the equity in the family residence in Lee's Summit, Missouri and would assume the future mortgage payments, the household furnishings and a Chevrolet automobile, as alimony in gross. The defendant was to receive a 1960 Pontiac automobile (described as practically inoperable) and a 1970 Oldsmobile, upon which the defendant was making payments.

The defendant further agreed that subject to court approval, the plaintiff would have custody of the three minor children and that he would pay $360.00 per month for their support, reserving visitation privileges.

This agreement disposed of practically all of the marital property, except a small savings account and 5 shares of AT&T stock, both of which were liquidated by the defendant to pay costs and attorney's fee. He stated that this left him with the two cars and "the clothes on my back".

On January 11, 1971, the plaintiff and her then counsel and counsel for the defendant appeared in Division No. 8 of the Circuit Court of Jackson County, the defendant withdrew his answer and cross-petition, and a default judgment was entered in favor of the plaintiff, granting her a divorce, the custody of the children, $120.00 per month per child, reasonable visitation to defendant, and for costs. During the course of this hearing, the plaintiff identified the property settlement agreement, stated she understood its terms as to gross alimony, that she was not asking for any permanent alimony and understood she could not come back into court in the future and seek alimony. She stated she was looking for work and could do some work to earn money.

Nothing was placed in the record or before the court as to the plaintiff's past mental and emotional problems nor her confinement in Western. No guardian ad litem was appointed for her.

On March 30, 1971, defendant filed a motion for modification of order of custody of minor children, based upon a change of condition. His grounds were that plaintiff had not obtained employment, had allowed the home mortgage to become in default, and bills for utilities and necessities to become overdue, had neglected the children, had physically attacked defendant, and was under the care of a psychiatrist and had hallucinations.

On April 26, 1971, another division of the Circuit Court, made an order granting defendant temporary custody of the children because of the illness of plaintiff. On April 29, 1971, the plaintiff appeared before that court by attorney and the defendant appeared in person and by attorney, and after hearing, the court granted custody of the children to the defendant and ordered that the child support to plaintiff should abate.

On August 27, 1971, plaintiff, through present counsel, filed a motion for temporary alimony, and on August 28, 1971, she filed her motion to set aside the divorce decree of January 11, 1971 upon the grounds above stated. On August 16, 1971, plaintiff had been readmitted to Western as an in-patient at the request of her sister and the Welfare office. On August 25, 1971, she was transferred to St. Joseph State Hospital for "Long term treatment. Job training and Placement".

The records of Western (P. Exh. No. 3) at this time contain some revealing information in the Narrative Summary, which seems to be relevant here. On page 1 of this summary, it is stated:

"Mrs. C——— has retained the services of Austin Shute, LL.D. He plans to claim Mrs. S———'s divorce was fraudulent as she was psychotic at the time. If Mr. Shute wins the case Mr. and Mrs. S——— will be legally married again and Mr. S——— will be responsible for his wife's debts. While such a state of

affairs will aid the patient financially it will be psychologically confusing to her."

And on page 2 of this summary, it is stated:

"My recommendations to Mrs. C——— has been that if Mr. Shute wins the court action there be legal restrictions placed on Mr. S———'s visits with and treatment of his wife."

On September 7, 1971, a hearing was had in the court below on plaintiff's motion to set aside the decree of January 11, 1971. The plaintiff's sister, Mrs. C———, was appointed next friend of the plaintiff and she appeared also by her then counsel. The defendant appeared in person and by counsel.

Plaintiff in support of her motion to set aside the decree offered a transcript of the hearing leading to the divorce decree on January 11, 1971 (P. Exh. No. 1) and the Mental Health file from the records of the Probate Court with reference to the plaintiff (P. Exh. No. 2). These were offered and admitted without objection.

Plaintiff offered as her witness Dr. Norman B. Coleman, M.D., the psychiatrist on the staff of Western, who had direct control and direction of plaintiff's treatment there since its inception. He identified the complete file on plaintiff (P. Exh. No. 3) which was offered and received into evidence without objection. He diagnosed plaintiff's mental condition as "Schizophrenia of paranoid type". Plaintiff was released from Western on October 5, 1970 on a trial basis. Pertinent here, he testified that during the six years of his contact and treatment of plaintiff "her cognitive function, her ability to calculate, to remember well, to do the calculation processes of the mind, were perfectly intact at all times", and that she still is "capable of reasoning logically, making decisions, managing her affairs" so long as such did not involve the delusional area. He stated that when plaintiff was released October 5, 1970, "she was able to make decisions and function normally as far as cognitive processes were concerned", she was able "to make judgments"

and was "capable of functioning in society". He stated that her mental illness was aggravated by her marriage; that it was keeping her upset; at that time, she was capable of taking care of her children and that her marriage was a precipitating stress. The following appears in the record (T. 44):

"Q Doctor, on October 7, 1970, I believe that is the date this divorce action was filed by Mrs. S———, based on your treatment of her and your examinations of her and your diagnosis, was she mentally competent, with the advice of an attorney, to proceed with a divorce action on October 7, 1970, in your opinion, based on a reasonable medical certainty?

A Yes, I think she was.

Q And she was capable, was she not, of making decisions about a divorce action proceeding and knowing the consequences of it, is that correct?

A Yes."

Doctor Coleman also testified that in his opinion, she was competent and able on January 11, 1971, the date of the decree. The record shows (T. 46):

"Q In other words, in your opinion she was competent to make decisions with regard to divorce proceedings and to proceed with the divorce on January 11, 1971 based on a reasonable medical certainty, is that correct?

A Yes."

Doctor Coleman's testimony, based upon his unchallenged qualifications, stands before us as the only live expert opinion evidence and *was proffered by the plaintiff*.

Mr. Rocha, her counsel in the divorce proceedings, testified that he had been advised by the staff at Western that the plaintiff had been released, that she should obtain a divorce for her own mental fitness, that he worked for and negotiated a settle-

ment for her as he would for any other client, that nothing she said or did indicated to him that she was not fully aware of the significance of her settlement and divorce, that she was kept fully advised at all times of the negotiations, and the implications of her waiver of alimony, and that he felt no obligation to bring up her past mental illness to the court at the default divorce hearing. He did get assurances that she had never been declared incompetent and the opinion of the staff at Western that she was mentally able to go ahead with the divorce.

The court below was not requested to and he did not make any specific findings of fact or conclusions of law, but some very significant comments do appear in the record. For example (T. 120):

"The Court: Well, I certainly don't feel that either one of the lawyers can be faulted. I wish I had known though. I would probably handled it differently * * *"

On January 4, 1972, the court sustained plaintiff's motion to set aside the divorce decree of January 11, 1971 upon the sole ground that had he known of plaintiff's involuntary hospital commitment at Western, he would have appointed a guardian ad litem to represent her. He made no finding that she was incompetent or unable to represent herself with counsel, nor that any fraud had been practiced upon her or upon the court by the defendant or anyone else. Nor did he make any further orders implementing this order which so materially and indeed violently affected the rights of the parties and the welfare of the children.

On February 4, 1972, the court allowed the plaintiff the sum of $400.00 as attorney's fees without any evidence of any kind offered as to the services covered by such allowance.

The decree of divorce was entered on January 11, 1971, and it became final on February 11, 1971. After the latter date, the court, as a matter of law, had no power to grant a new trial of his own initiative, Section 510.370 V.A.M.S., nor did he retain any control over said judgment as the trial judge, except as the same related to the care, custody and control of the minor children. Rule 75, Rules of Civil Procedure.

Section 452.110 V.A.M.S. provides in part:

"No petition for review of any judgment for divorce * * * shall be allowed, any law or statute to the contrary notwithstanding; but there may be a review of any order or judgment touching the alimony and maintenance of the wife, and the care, custody and maintenance of the children, or any of them, as in other cases."

With reference to this statute, this court said in Bernstein v. Bernstein, Mo.App., 351 S.W.2d 46 at l. c. 48:

"* * * This statute has long been in effect in this state and is the fixed public policy."

█ Since the divorce decree before us awarded the plaintiff no alimony (she asked for none because this had been settled by contract) and the court below was not asked for any order as to the minor children, the scope of that court's powers on the motion to set aside the decree was confined and narrowed to those which reposed in him as a chancellor in equity.

█ Under certain circumstances, an attack is permitted upon a final divorce decree by suits in equity or motions in the nature of writs or error coram nobis which invoke equitable doctrines. Such proceedings can be maintained upon the basis of fraud or mistake of material fact which if known would have prevented the entry of the decree. Under factual situations which demonstrate such matters in any particular case, our courts have held that the decree of divorce is voidable and equity can grant redress, although the decree attacked is final. Hemphill v. Hemphill, Mo.Sup., 316 S.W.2d 582; Hemphill v. Quigg, Mo.Sup.,

355 S.W.2d 57; Bernstein v. Bernstein, Mo. App., 351 S.W.2d 46; Sigwerth v. Sigwerth, Mo.App., 299 S.W.2d 581.

■ The matter before us was raised by "Motion to Set Aside Decree of Divorce" filed in the original divorce proceedings. We will treat it as a proceeding in equity constituting an attack upon the divorce decree which the court below had equity jurisdiction to consider.

Plaintiff below (respondent here) attempts to justify the chancellor's judgment upon two primary grounds. *First*, plaintiff asserts that the court below properly set aside the decree because at the time of its entry, she was under an order of involuntary hospitalization as *mentally ill*, issued by the probate court of Jackson County, Missouri, and was therefore *mentally incompetent* "to make decisions affecting a divorce suit at any time during the divorce proceedings" and this is particularly true "as to the waiving to (sic) her rights to alimony" (T. 17). *Second*, that her situation as a mentally ill person should have been brought to the attention of the court below, it was not, and that "it would be against the public policy of the State of Missouri and a fraud on the court to allow an individual to secure a divorce when she is mentally ill" (T. 17/18).

The appellant, on the other hand, vigorously asserts that no fraud or mistake of fact was shown; that no facts were offered to warrant the intervention of a court of equity in setting aside the final decree; the court acted in excess of his jurisdiction; and that the plaintiff (respondent) is estopped from attacking the divorce decree.

■ It is, at best, an unpleasant and depressing task for any court to review the tragic and sordid details of this type of case, with all of its inherent social, domestic, economic and public policy implications. This, we must do, however, and under the specific obligations, as stated in Bernstein v. Bernstein, *supra*, where this court said, 351 S.W.2d 46 at l. c. 47:

"This being a proceeding in equity, we review the case de novo upon both the law and the evidence. We determine on the whole record what relief, if any, should be granted. McCarty v. McCarty, Mo., 300 S.W.2d 394, 399; Picadura v. Humphrey, Mo., 335 S.W.2d 6, 12."

■ As another preliminary observation before ruling the issues now before us, it is not inappropriate to observe that at the hearing of the divorce action, the plaintiff proved her case by uncontradicted testimony, and she was therefore entitled to a divorce decree, a right conferred upon her by statute. The court below had no discretion except to grant the divorce. Hess v. Hess, Mo.App., 183 S.W.2d 560, 565; Needham v. Needham, Mo.App., 299 S.W. 832; Dunn v. Dunn, Mo.App., 216 S.W.2d 141, 142.

■ In light of the fact that the parties both represented by competent counsel had entered into a formal contract, finally settling their respective property rights and the plaintiff identified and reaffirmed this contract under oath, the court below was presented with no judicial choice but to enter the decree without an alimony award. North v. North, Mo.Sup., 100 S.W.2d 582; Alverson v. Alverson, Mo.App., 249 S.W.2d 472; Edmondson v. Edmondson, Mo.App., 242 S.W.2d 730; Singer v. Singer, Mo. App., 390 S.W.2d 605; Bloss v. Bloss, Mo. Sup., 251 S.W.2d 78; State ex rel. Green v. James, Mo.Sup., 195 S.W.2d 669, 673. Our divorce courts are without jurisdiction to settle, by judicial decree, any property rights as between competent husband and wife who, dealing at arm's length and fairly, reach their own agreement.

So this matter resolves into the fundamental and simple problems of whether or not the plaintiff was legally competent to do what she did, and whether or not a fraud was practiced upon her or the court.

■ We have reached the conclusion that the plaintiff was *sui juris* and is therefore bound by her acts with reference to the

divorce action; that no evidence of fraud was offered; and the court below erred in setting aside the divorce decree of January 11, 1971.

As to the plaintiff's mental capacity, the record before us shows that in September of 1970, an order was issued placing the plaintiff under involuntary hospitalization according to the provisions of Chapter 202, V.A.M.S. This part of our law is relatively new in origin and deals with "Mental Hygiene and State Hospitals". The portions of that law relevant here deal with "Commitment and Hospitalization of Mentally Ill". One of the methods whereby such hospitalization is accomplished is on court order. Section 202.807 V.A.M.S. deals with the procedures in the probate court for involuntary hospitalization, and of particular significance here is Section 202.807(5) which provides:

"5. If, upon completion of the hearing * * * the court finds that the proposed patient is mentally ill, and is in need of custody, care, or treatment in a mental facility and, because of his mental condition, lacks sufficient insight or capacity to make responsible decisions *with respect to his hospitalization*, it shall order his hospitalization for an indeterminate period; * * *" (Emphasis supplied)

Section 202.827 V.A.M.S. authorizes the head of such hospital to discharge a patient when the conditions justifying involuntary hospitalization no longer obtain.

Section 202.830 V.A.M.S. authorizes the head of the hospital to put the patient on "convalescent status" and order his release for outpatient care before either final release or rehospitalization.

Section 202.847 V.A.M.S. provides in part as follows:

"1. Subject to the general rules and regulations of the hospital and except to the extent that the head of the hospital determines that it is necessary for the medical welfare of the patient to impose

restrictions, every patient shall be entitled:

\* \* \* \* \* \*

(3) *To exercise all civil rights*, including the right to dispose of property, *execute instruments*, make purchases, *enter contractual relationships*, and vote, *unless he has been adjudicated incompetent* and has not been restored to legal capacity." (Emphasis supplied)

Section 202.010(12) V.A.M.S., containing definitions applicable to this chapter, states in part:

" 'Mental illness' is a state of impaired mental function * * * to such an extent that a person so afflicted requires care and treatment for his own welfare * * * without regard to whether or not such person has been adjudicated legally incompetent."

Proceedings under this chapter are of an entirely different type than an adjudication of incompetency or finding of unsound mind under the probate code. Where such an adjudication of incompetency is made under said probate code, it is specifically provided that any contracts made by an adjudicated incompetent are not valid or binding. Section 475.345 V.A.M.S.

██ It is admitted that the plaintiff herein had never been adjudicated an incompetent under the probate code, and under the law, sanity is presumed prior to an adjudication or until evidence of insanity is introduced. Hemphill v. Hemphill, Mo.Sup., 316 S.W.2d 582, 586; Schuler v. Schuler, Mo.App., 290 S.W.2d 192, 194; Willis v. Willis, Mo.App., 274 S.W.2d 621.

██ The law is equally clear in Missouri that an order for involuntary hospitalization under Section 202.807 V.A.M.S. is not an adjudication of insanity or incompetency, in view of the definition of "mental illness" in that chapter, and particularly the provisions of Section 202.847 V.A.M.S., wherein the Legislature specifically declared such patients *sui juris* and pre-

served all of their civil rights. Murphy v. Murphy, Mo.Sup., 358 S.W.2d 778, 781.

The rule was stated in In re M——, Mo.App., 393 S.W.2d 109, at 1. c. 115, as follows:

" * * * As the matter is usually put by our cases * * * there is a presumption of competency or sanity which obtains until evidence to the contrary appears. Nor do we suggest that mental illness automatically operates or would necessarily operate in this case to excuse the defendant from the consequences of his conduct. He has never been adjudicated an incompetent, within the meaning of Section 475.010, par. (3), *and involuntary hospitalization and treatment for mental illness is not, under our law, an adjudication of technical or legal insanity,* * * *Our decisions also recognize that mental illness may co-exist with mental capacity.* * * *" (Emphasis supplied)

See also: McElroy v. Lynch, Mo.Sup., 232 S.W.2d 507, 514; Forbis v. Forbis, Mo. App., 274 S.W.2d 800, 807.

 Under the authority of these decisions, and others to like effect, the mere fact that the plaintiff had been committed under an involuntary hospitalization order, did not affect her civil right to bring and maintain her divorce action or to enter into the property settlement agreement with the defendant, providing for alimony in gross. The record is likewise completely devoid of any proof that the plaintiff was in fact incompetent or insane, and the burden of proof in that regard was on her.

In Willis v. Willis, Mo.App., 274 S.W.2d 621, the court in ruling as to the weight of evidence to support a claim of insanity or incompetence said, 1. c. 627, 628:

" * * * The requirements of this test are not satisfied by a showing of insane delusions * * *, highstrung nerves, unrestrained impulsiveness and lack of control * * * mental irresponsibility, * * * psychoneurosis * * * a

manic-depressive condition * * * or depraved character and licentious disposition even in a person of weak mind * * *."

See also: Schuler v. Schuler, Mo.App., 290 S.W.2d 192, 199.

To the contrary, the evidence offered by the plaintiff at the hearing of her motion to set aside the divorce decree upon this ground consisted of the expert testimony of Dr. Norman B. Coleman, M.D., whose testimony is summarized above, to the effect that she was mentally competent on October 7, 1970 when the suit was filed, and on January 11, 1971, when the decree was entered. In addition, she offered the testimony of her sister, whose knowledge of the plaintiff's condition during this period of time consisted entirely of 3 or 4 telephone conversations with the plaintiff.

Another factor which is worthy of our consideration at this point is, that the plaintiff had been advised by those charged with her care, including Doctor Coleman, that it would be beneficial and therapeutic for her mental health to separate from and divorce the defendant. Also, we should note that we are not confronted with a situation where the alleged incompetent was unsuccessful, but rather, with a situation where the plaintiff obtained everything that she asked for, including practically all of the marital property except an inoperable automobile and a mortgaged one.

As was said in the case of Allen v. Kelso, Mo.Sup., 266 S.W.2d 696, 1. c. 704:

" * * * There were no suggestions of insanity made at the trial. This case has resulted in the plaintiff receiving all the relief he sought or which it was possible for him to receive. As in the case of an infant appearing by attorney, when a plaintiff is 'blest by success' in maintaining his cause, the matter is on a different basis from a situation in which the result is adverse. See, Reinemen v. Larkin, 222 Mo. 156, 121 S.W. 307. In an action by an insane person such a favorable judgment is not void * * *"

In Williams v. Pyles, Mo.Sup., 363 S.W. 2d 675, the court said, l. c. 678:

" * * * There is a vast difference in a case in which an allegedly insane litigant is successful and one in which, as here, he is unsuccessful. Allen v. Kelso, * * *"

■ The plaintiff makes the further charge that the action of the court below in setting aside the decree was proper because of fraud. It is unclear from the record or from plaintiff's brief whether this charge of fraud is based solely upon the fact that the plaintiff was incompetent (which fact has been shown to be unsupported by law or evidence) and that such incompetency was not disclosed to the trial court or whether it is claimed that some type of fraud was perpetrated upon the plaintiff. Even though there is unquestioned authority for an attack upon the judgment, including divorce decrees upon the ground of fraud, the burden of proof in such an action is upon the person charging the fraud. In F—— v. F——, Mo.App., 333 S.W.2d 320, the court said, l. c. 325:

"In an action of this nature the plaintiff not only has the burden of proof * * * but he must establish the fraud in the procurement of the judgment by evidence which is clear, strong, cogent and convincing * * *"

See also: Reger v. Reger, Mo.Sup., 293 S.W. 414.

■ It is further the law in Missouri that in such an action, the fraud does not go to the propriety of the judgment itself but to the manner in which the judgment was obtained. The fraud must have been extrinsic or collateral and the person charging the fraud must show that he himself was free from fraud, fault or neglect. Jones v. Jones, Mo.App., 254 S.W.2d 260.

■ The record before us clearly indicates that not only did the plaintiff fail to meet this burden of proof, but there was a total absence of any substantial evidence of any fraud perpetrated upon the plaintiff or the court. The plaintiff was represented throughout by able counsel and was also apparently receiving advice as to her domestic affairs from her doctor and other personnel at Western. She was the moving party and was the successful party. The trial court openly and on the record exonerated counsel from any fault for not advising him of the plaintiff's mental health. Indeed, it would not only be unnecessary but ill-advised (because of the children involved) to burden the record with an account of the plaintiff's mental illness which had no legal bearing or impact upon the proceedings and which, as has been demonstrated, would have neither empowered nor justified the court below to take any action other than grant the decree.

We hold that there was a failure of proof as to the fraud alleged. The court below, therefore, lacked jurisdiction to set aside the final decree of January 11, 1971 on that ground.

■ The only remaining question before us is the validity of the order of February 4, 1972, allowing the plaintiff $400.00 attorney's fee for services rendered her by her present counsel in filing and prosecuting the motion to set aside the divorce decree. Our holding that the court below lacked jurisdiction to set aside the divorce decree leads to the inevitable conclusion that the parties were no longer married when that decree became final on February 11, 1971. The court, therefore, likewise lacked jurisdiction to allow the former wife attorney's fees for this type of proceeding. 24 Am.Jur.2d, Divorce and Separation, Section 586; Hogsett v. Hogsett, Mo.App., 409 S.W.2d 232; Schenberg v. Schenberg, Mo.App., 307 S.W.2d 697.

Accordingly, the judgment of the court below of January 4, 1972, setting aside the decree of divorce to the plaintiff herein, is reversed and the cause is remanded with directions to reinstate the decree of divorce of January 11, 1971 and the modification

order thereof as to child custody of April 29, 1971. The judgment and order of the court below of February 4, 1972, allowing plaintiff the sum of $400.00 attorney's fee is reversed.

All concur.